EVERS, J.T.C.
These 1978,1979 and 1980 local property tax matters concern the valuation of a. multi-tenanted three-story office building situated on 2.048 acres known as 580 Sylvan Avenue (Route 9W) and also known as Block 806, Lot 9, Englewood Cliffs. Discrimination is alleged in all years. A revaluation was effective for the 1978 tax year. The $2,115,600 assessment was affirmed by the Bergen County Board of Taxation in 1978 and 1979. The 1980 appeal was filed directly with the Tax Court.
As is often the case in such matters the opinions of value of the two expert witnesses differed considerably. Relying solely on the income approach, taxpayer’s witness concluded the true value to be $1,682,500, $1,767,700 and $1,936,900 for the three years under review. Borough’s witness, relying primarily on a market (comparable sales) approach, found it to be $3,000,000 for all years. Both parties agree that a continuation of office use represents the highest and best use of the property.
The land was described as being fairly rectangular with frontage on Sylvan Avenue (Route 9W) of 150 feet and an average depth of 545 feet. The frontage is at street grade for a *198 depth of approximately 75 feet and then slopes gently to the rear. All utilities are available to the site and in use. The property satisfies the requirements of the commercial zone (B-2) in which it is located.
Situated on the tract is a three story and part basement (the latter being at grade level in the rear) masonry and steel frame commercial office building which was constructed approximately in 1968 and is considered to be in normal condition with little or no deferred maintenance. The structure contains 56,926 square feet with 49,620 square feet available for leasing, according to taxpayer. The building is leased to a number of relatively small commercial office tenants. Paved parking areas are located to the front and rear of the structure. The front area is landscaped.
Englewood Cliffs was described as an upper-class commercial location atop the palisades overlooking the Hudson River and located approximately 1.5 miles north of the George Washington bridge. The borough has clearly become an outstanding location for office building development in the area. It is the home of many major corporations such as Lipton Tea, Scholastic Magazines, Volkswagen, Korn Products International and Prentice-Hall. Route 9W is one of the two major arteries in the borough.
As earlier noted, taxpayer relied exclusively on the income approach in valuing the property primarily because it is an investment/income-producing property and, as such, the taxpayer reasoned that a potential buyer would base the purchase price on the income to be derived from his investment. The market (comparable sales) analysis was rejected because, in the opinion of taxpayer’s expert, utilization of that approach requires detailed and full knowledge of all the terms and conditions of the sales as well as their financial terms. According to the witness he was not privy to such information concerning area sales. The replacement cost approach was rejected by taxpayer for various reasons but principally due to the difficulty in the measurement of all forms of depreciation.
*199 While borough’s appraiser utilized the three standard approaches to value he relied most heavily on the comparable sales analysis. His appraisal report did contain a skeletal cost approach analysis based on the Real Property Appraisal Manual For New Jersey Assessors, but it is obvious that he placed little or no weight on this approach. Except for his mere reference to the manual there was no support for several key elements, particularly the 8% physical depreciation allowance for this 10-12 year old building which assumes a physical life of over 120 years. Although he presented a comprehensive economic analysis it was the opinion of borough’s expert that the income approach does not readily support actual values obtained in the market place.
In Parsippany Hills Assocs. v. Parsippany-Troy Hills Tp., 1 N.J.Tax 120 (Tax Ct.1980) this court observed:
In valuing income-producing property, a prospective purchaser’s primary concern is with the anticipated return on his investment and not the cost of construction or the price for which similar properties may be sold; however, it is recognized that the comparable sales approach may be useful as an indicator of value provided the degree of comparability between the subject and sales properties is clearly established, [at 122-123]
Taxpayer urges the total rejection of the comparable sales approach as utilized by borough by reason of the latter’s failure to establish the degree of comparability required for that approach to carry any weight. “Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties so as to admit of reasonable comparison.” Venino v. Carlstadt Boro., 1 N.J.Tax 172, 175 (Tax Ct.1980).
The list of comparable sales of borough’s expert is impressive and, at least facially, supports his contentions that the market was basically comprised of owner-occupied office buildings and that the market approach is the most reliable in arriving at an estimate of value of the subject property. The five sale properties relied on were all located on Sylvan Avenue in close proximity to the subject, were devoted to office use and were located in the same zone as the subject. Four of the buildings were constructed in the 1962-1965 time period while one was built in *200 1970. The properties were sold between September 1975 and November 1978 for prices ranging between $40.50 and $62.25 a square foot for an average price of $50.26 a square foot, according to borough’s witness. Based on these sales the witness concluded that the subject property had a value of $50 a square foot and a total value, including land, of $3,074,000 (rounded to $3,000,000) for all years in question.
The existence of these five transactions does not convince the court that the market consisted exclusively of owner-users. If such were the case, how does one explain the existence of the many multi-tenanted investor-owned office buildings in close proximity, the rents from which both experts relied on in their search for economic rents in connection with the income approach? Although borough’s opinion may in the future become fact, as of the assessment dates under consideration herein, that opinion can be viewed only as a prophecy and as premature.
In effect, borough claims, notwithstanding the investment nature of the property which lends itself to a valuation on the basis of the income approach, the property should be valued as if used solely by its owners, which it is not, in which case the market approach may carry considerable weight in the valuation process. Property to be assessed, whatever may be its character, is to be taken and valued in the actual condition in which the owner holds it. Stevens Inst. of Technology Trustees v. State Board &c., 105 N.J.L. 99, 101, 143 A. 356 (Sup.Ct.1928), aff’d 105 N.J.L. 655, 146 A. 919 (E. & A.1929). Property should be assessed in the condition in which it is utilized and the burden is on the person claiming otherwise to establish differently. Berkeley Develop. Co. v. Berkeley Heights Tp., 2 N.J.Tax 438 (Tax Ct.1981).
Here, as previously noted, borough did not sustain its burden of showing that the market consisted primarily of owner-occupied office buildings. Nor did it prove that the hypothetical purchaser envisioned in N.J.S.A. 54:4-23 would pay that price for the subject property for conversion to such form of ownership. Thus, while the sales and subject properties may *201 possess many physical similarities any discussion concerning comparability would be an academic exercise because there has been no showing that the building should be treated other than as a rental property.
Secondly, in the case of owner-users the motivation for the acquisition may, and usually does, have an effect on the price paid. That such was the case here is evident when a comparison is made between borough’s witness’ income and direct comparison approach results based on these five sales. His income approach based on estimated square-foot rents produced a value approximately $700,000 less than his direct comparison value. There may be any number of reasons for this difference, not the least important of which is the fact that an owner-user will pay more for a specific property than will a typical investor. The owner-user is not concerned with factors such as multiple tenants, rent collections, management, vacancies and risk — as is the investor. On the other hand, factors such as aesthetics, price, comfort and other such intangibles which do not relate to market value and are more often than not of little concern to the investor are often of paramount importance to the owner-user. All such factors are reflected in price. Reliance on that price is akin to reliance on original cost of construction where very often such factors as above noted increase the costs but not the market value. As was stated in Haworth v. State Board of Tax Appeals, 132 N.J.L. 306, 40 A.2d 353 (Sup.Ct.1944), “Cost is never conclusive on the question of value for tax purposes. Expensive buildings are frequently sold for much less than cost is common knowledge.” At 308, 40 A.2d 353.
For the above stated reasons, primary reliance will be placed on the capitalization of income approach in determining the value of the subject property.
In his capitalization of income approach taxpayer’s witness employed the building residual technique. In defining that technique the American Institute of Real Estate Appraisers, The Appraisal of Real Estate, (8 ed. 1983) states:
*202 When using this technique, an appraiser assumes that land or site value can be estimated independently. Starting with the known land value, the appraiser applies the land capitalization rate to the land value to obtain the amount of annual net income necessary to support land value. The appraiser then deducts this amount from the net operating income to derive the residual income available to support the investment in the building(s). The appraiser capitalizes this residual income at the building capitalization rate to derive an indication of the building(s)’s present value. Finally, the appraiser adds the land value to the building value to derive an indication of property value. The appraiser applies the land and building capitalization rates derived from the market to the subject property ....
The building residual technique requires information about present land value, current net operating income, and the land and building capitalization rates. If such information is unavailable or not reliably supported, the technique should not be employed, [at 395-396; emphasis supplied]
Taxpayer’s witness produced no support for his use of $665,-600 ($325,000 an acre) as the value of the land component in 1978 and which was increased by approximately 3% in each succeeding year. No independent investigation as to land value was conducted; he simply accepted the assessment of $665,600. This lack of support may, in and of itself, be sufficient reason for dismissal. See Brick Assocs. v. Brick Tp., 4 N.J.Tax 510, 513 (Tax Ct.1982); Andrew Realty Co. v. Little Falls Tp., 2 N.J.Tax 114 (Tax Ct.1981). However I do not view this flaw in taxpayer’s analysis as a fatal defect particularly where, as here, the totality of the evidence permits me to make a determination of value. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 208 A.2d 153 (App.Div.1965).
In support of his land valuation of $819,000 (approximately $400,000 an acre) borough’s expert referred to eight land sales, conceding, however, that several transactions (sales number one through five) were utilized only to show the increase in land values over a protracted period. Sale number six, which was consummated in December 1974, involved the conveyance of 2.99 acres for $935,000 which is equivalent to $312,000 an acre. In December 1981, 3.58 acres (sale number seven) were sold for $1,543,521 or $430,550 an acre. Sale number eight involved a September 1981 sale of 4.25 acres for $1,912,500 or $450,000 an acre. The three sales properties were all located on Route 9W in close proximity to the subject and were all zoned for business *203 use. These sales, coupled with the six earlier sales, show a contrast in the acre price paid for vacant land in this zone starting with $85,200 an acre in 1966, advancing to $312,000 an acre in 1974 and up to $430,550 an acre as of 1981. While the evidence supports a finding of value of $400,000 an acre in 1980, I find it was less than that value as of the assessing dates for 1978 and 1979. Considering the data shown by these comparison sales it is my conclusion that the land had an acre value of $350,000, $375,000 and $400,000 for 1978, 1979 and 1980 respectively.
Turning to an analysis of their respective capitalization of income approaches, the principles enunciated in New Brunswick v. Tax Appeals Div., 39 N.J. 537, 189 A.2d 702 (1963), must be noted:
The first problem is to find the fair rental value to which the capitalization rate will be applied.... No doubt the fair rental value, rather than the actual rent payable under an existing lease, must control, [at 544, 189 A.2d 702]
Taxpayer’s expert estimated separate economic rents (fair rental values), for each of the three years in question. For 1978 he referred to the 21 leases of space in the subject premises which were in effect as of December 31, 1977, the terms of which varied from two to five years and the area leased from 250 to 7,500 square feet. The lease terms commenced between 1973 and 1976 with the inception dates of the majority being 1976 with an average rent of $6.94 a square foot. He further referred to renewal leases of existing tenants and/or new leases in the subject which totalled five in number, two of which commenced in early 1978, for terms not in excess of five years for areas ranging between 550 and 2,150 square feet with an average rent of $7.33 a square foot. Lastly, he referred to eight leases in a building known as 140 Sylvan Avenue, covering 18,523 square feet for a total rental of $143,227 or an average square foot rental of $7.73. These leases commenced in 1977. Claiming that 140 Sylvan Avenue enjoyed a superior location because it was one-half to one mile closer to the George Washington bridge, taxpayer’s witness estimated that the rents should be adjusted downward between 10% and 15%. In addi *204 tion to that adjustment of the 140 Sylvan Avenue rents the appraiser, because of the time factor and based on his opinion that renewal leases of existing tenancies usually command lower rents than do leases to new tenants, made an upward adjustment of the leases in the subject premises. He, thus, estimated the economic rent as of October 1,1977 for the 1978 tax year to be $7.50 a square foot.
For 1979 he referred to 11 leases of the subject premises all of which commenced in 1978 covering 22,380 square feet at an average square foot rental of $7.52. He also rejected these actual rents (as he did for 1978) and, reasoning that rents were increasing approximately $1 a square foot a year, found an economic rent of $8.50 ($1 a square foot greater than for 1978) as of October 1, 1978 for the 1979 tax year. Employing the same rate of annual increase his estimated economic rent for 1980 was $9.50 a square foot.
On the basis of rentals in premises immediately adjacent to the subject, borough’s appraiser estimated an economic rent for all years at $9.50 a square foot. Clearly, in terms of size, location and age that property was comparable to the subject. Two of the leases commanded rents of $8.50 and $8.80 a square foot for the early to mid-1970 period. The witness also referred to several of the leases of the subject (also relied on by taxpayer) which were at the top of the rent scale. Finally, he referred to a lease of 11,500 square feet of the subject building for five years commencing mid-1980 for $14 a square foot. Taxpayer argued that this apparent inordinately high rental resulted from the landlord’s expenditure of approximately $50,000 for renovations as well as payment of a real estate commission of $38,000. This $88,000 sum was to be recaptured through the rent. Based on taxpayer’s testimony, it is clear that, by virtue of the five-year term, this one time expenditure was to be recaptured over the life of the lease at a rate of $17,600 a year. Certainly taxpayer had no reason to expect to recapture the sum of $88,000 in each year of the lease. By extending it over the five-year period the annual rent is $143,400 which equates to over $12 a square foot.
*205 Borough, attacking the credibility and judgment of taxpayer’s appraiser, also referred to an appraisal report authored by the latter in which, as of October 1977, he estimated the market rental of an office building located at 120 Sylvan Avenue to be $8.25 a square foot. This ten-year old three-story structure contained 45,684 square feet (gross) and was situated on a 1.8 acre tract. Its construction was very similar to the subject.
A review of all the evidence concerning income leads me to conclude, as was concluded by both experts, that the actual rents did not represent economic rent. I find that, while taxpayer’s estimate of $9.50 a square foot rent for the 1980 tax year was realistic, his estimates of $7.50 and $8.50 for the two prior years is not supported by the record. It is interesting to note that the leases of 140 Sylvan Avenue, with one exception, commenced in the first half of 1977. By deleting from my calculations the rental in one lease which represented 40% of the area (larger areas command lower square foot rents) I find the average rent of that structure was $8.45 a square foot. But for taxpayer’s argument that its slightly closer location to the George Washington bridge rendered it superior when compared with the subject (the logic of which argument escapes me and which was not supported by the proofs) 140 Sylvan Avenue and the subject were admittedly comparable. These rents are also supported by the appraisal of taxpayer’s expert of the 120-Sylvan-Avenue-of-fice building immediately adjacent to 140 Sylvan Avenue for which, as of October 1977, he estimated an economic rent of $8.25 a square foot. They find further support in the rents relied on by borough in the building adjacent to the subject which exceeded $8.50 a square foot in the mid-1970s. On the basis of these rents I find the economic rents of the subject building to be $8.50, $9.00 and $9.50 a square foot respectively for the three years under review. The gross income is thus found to be $421,770 in 1979, $446,580 in 1980 and $471,390 for 1981.
Both experts allowed a deduction for vacancies of 5%. Annual rent collections are typically less than the potential annual gross income; therefore, an allowance for vacancy and collection *206 loss is typically included in an appraisal of income-producing property. The allowance is usually estimated as a percentage of potential gross income. The percentage varies according to the type and characteristics of the physical property, the quality of tenancy, current and projected supply and demand relationships, and general and local economic conditions. The Appraisal of Real Estate, supra at 361. In an income analysis the search is for the projected net income stream to be transformed into value by means of a capitalization process. A proper vacancy factor to be used in a projection of net income is not necessarily the actual vacancy experience but rather what an informed investor could reasonably foresee as a typical pattern. Although the testimony suggests .that the actual vacancy rate was something less than 5%, in view of the foregoing I will defer to the expertise of both witnesses as well as Evid.R. 3[1] and accept the 5% allowance.
The experts also differed little in their expense allowances; borough’s ratio of expenses to effective gross income was 40% while taxpayer’s ratio ranged between 40% and 43%. However the virtual absence of disagreement does not impose an obligation on the court to accept such allowances. The judiciary and fact-finding bodies are not bound by the opinions of expert witnesses. Wright v. Purepac Corp., 82 N.J.Super. 100, 111, 196 A.2d 695 (Cty.Ct.1963). The weight to be given to an expert’s opinion depends especially on the facts and reasoning which are offered as the foundation of his opinion. Ocean City v. Landolfo, 132 N.J.Super. 523, 528, 334 A.2d 360 (App.Div.1975). The weight and value of expert testimony are for the trier of the facts. Robbins v. Thies, 117 N.J.L. 389, 398, 189 A. 67 (E. & A.1937). An expert’s opinion may be adopted in whole or in part or completely rejected. Middlesex Cty. v. Clearwater Village, Inc., 163 N.J.Super. 166, 394 A.2d 390 (App.Div.1978), certif. den. 79 N.J. 483, 401 A.2d 239 (1979).
*207 I find no reason to reject the actual expenses incurred by taxpayer for wages, payroll taxes, fuel, water, legal, accounting, insurance and the like, as well as a 5% (of effective gross income) allowance for management expense which is fair and reasonable. Those expenses amount to $99,330, $100,513 and $116,649 for 1978, 1979 and 1980 respectively. However, I find no reason to accept the allowances for repairs and maintenance and reserve for replacements. With respect to these items the record shows virtually a complete absence of any support or explanation for allowing deductions of 16% (1979) and 14% (1980) for repairs and maintenance and 3% for reserve for replacements. In fact, after deducting 5% for management and 1.5% for reserves, borough’s witness, without any explanation whatsoever, simply made an additional 33Vs% deduction for “all other” expenses.
For 1978 taxpayer’s expert deducted the sum of $37,700 (approximately 10% of his estimate of effective gross income) for repairs and maintenance, which was the sum actually expended. I will accept this percentage of gross income as being reasonable in view of the testimony which clearly indicates that the building is in good repair with little or no deferred maintenance. However, even allowing the taxpayer the benefit of all inferences, I do not accept the unsupported and inordinately high allowances of $63,732 (14-16%) for 1979 and 1980. The record does not contain even a hint of reason for such expenditure. This expense item will thus be stabilized at 10% for each year based on the 1978 experience.
An allowance of 2% (of effective gross income) as a reserve for replacements is also found to be fair and reasonable. In support of his claim of 3% taxpayer’s witness claimed that the parking lot and roof, the latter having a 12-year life, would require replacement. He estimated the cost of roof replacement at $25,000 and parking lot repaving at $50,000. A 2% allowance translates to a reserve of approximately $100,000 over a 10 year period which sum is adequate for the purposes suggested by the witness.
*208 The income and expense for each year must be reconstructed on the basis of $8.50, $9.00 and $9.50 square-foot rentals, 5% vacancy rate, 10% for repairs and maintenance, 2% for reserves, 5% for management and actual expenses in all other categories. By deducting total expenses of $149,942, $154,103 and $173,216 from gross income of $400,682, $424,251 and $447,821 (after vacancy allowances) the net income is $250,740, $270,148 and $274,605 for each year under review respectively. However, in order to derive a proper rate at which to capitalize the income, an effective tax rate must first be established by virtue of discrimination having been made an issue. New Brunswick v. Tax Appeals Div., supra. In 1979 and 1980 the taxpayer seeks such relief pursuant to what is commonly referred to as Chapter 123.[2] Accordingly, the effective tax rate will be determined by applying the Chapter 123 ratio to the actual rates. A different situation is presented with respect to 1978 where, because a revaluation was effective for such year, Chapter 123 relief is not available.[3] Notwithstanding such revaluation taxpayer claims that its property was assessed at a ratio to true value substantially higher than what it perceives to be the common level of assessments in Englewood Cliffs.
In providing that Chapter 123 does not apply in the year of a revaluation or reassessment the Legislature could not have intended to deny a taxpayer its constitutional right to attempt to prove inequality in assessment. Chapter 123 simply provides that a taxpayer may not rely on its terms to establish discrimination in the year of a revaluation or reassessment but it does not follow that this prohibition precludes an attempt to *209 establish discrimination by other proofs. Although a revaluation or reassessment program carries with it a presumption of uniformity it cannot be said that the Legislature intended to deny a taxpayer the right to demonstrate by competent proofs that uniformity was not achieved with respect to that taxpayer. See Sunshine Biscuits, Inc. v. Sayreville Bor., 4 N.J. Tax 486 (Tax Ct.1982). Furthermore, construing the opinion in Murnick v. Asbury Park, 187 N.J.Super. 455, 455 A.2d 504 (App.Div.1982), in Weyerhaeuser Co. v. Closter Bor., 190 N.J.Super. 528, 464 A.2d 1156 (App.Div.1983) the Appellate Division stated:
Murnick overruled the tax court holdings that Chapter 123 is a “rebuttable presumption.” Mumick seems to deny all parties the right to rebut the statutorily promulgated common level and average ratio. However, tax discrimination is a constitutionally mandated remedy available to taxpayers and municipalities. If the figures established by Chapter 123 for the average ratio and common level are arrived at in an arbitrary, capricious, or erroneous manner, or arc themselves discriminatory, a litigant would be deprived of this constitutional remedy unless he had the right to challenge them. We do not, however, read Mumick to hold that Chapter 123 establishes an exclusive remedy in such instances.[5]
Obviously, if a party has the right to challenge the ratio promulgated by the Director pursuant to Chapter 123 and, if successful, to have a different ratio or common level applied to true value, that same right exists in the year of a revaluation when Chapter 123 relief is not available.
Taxpayer urges that for 1978 there was a common level of assessment in the borough. This common level, according to taxpayer, was at a percentage equal to the unweighted, unclassified sale-assessment ratio determined as of October 1 of the tax *210 year.[4] Hence taxpayer argues that this ratio should be applied to the actual tax rate and then to the true value in order to obtain the effective tax rate and proper assessment respectively. In support of this argument taxpayer’s expert provided a ratio analysis of the statistical data utilized by the Director of the Division of Taxation. The study, which consisted of a two page summary in the appraisal report as supplemented by brief testimony, was based on 83 sales (12 vacant-land, 67 residential and 4 commercial). The ratio clustering showed that 75 sales fell within the 50%-89% range which, according to taxpayer, supports the expert’s conclusion that the common level was the unweighted unclassified ratio of 69.95%. In his testimony the witness first stated that he did a six month study but in response to a question by the court, later stated that he utilized all the useable sales for 1978. He was unable to state the number of line-items in Englewood Cliffs for 1978 and thus the proportion of the sample, based on the 83 sales, cannot be determined. The foregoing represents the sum and substance of his testimony concerning the ratio study.
I find that taxpayer’s use of the sales, which occurred during the tax year under review, to attempt to prove that the assessment, which was made as of October 1 of the pretax year and was based on information available at and prior to that date, is most inappropriate. Confronted with a similar situation, Judge Crabtree in Rudd v. Cranford Tp., 4 N.J.Tax 236 (Tax Ct.1982), stated:
The chapter 123 ratio is promulgated by the Director as of October 1 of the pretax year. N.J.S.A. 54:1-35a. Plaintiff, however, uses the unweighted, unclassified ratio promulgated as of October 1 of the tax year. Plaintiff’s comparison is inappropriate. The constitutional sufficiency of the statutory *211 remedy for discrimination can only be examined by comparing two ratios promulgated as of the same date. Given the obvious fact of a significant annual appreciation in value of the generality of properties in a municipality such as Cranford, and the reflection thereof in a declining average ratio, the use of a ratio promulgated one year later than the ratio with which it is compared in aid of ascertaining the latter’s constitutional adequacy is manifestly unfair and inequitable to defendant and its other taxpayers, [at 248-249]
In Englewood Cliffs, as was the case in Cranford, it is obvious that land and building values have been, and are, appreciating significantly. The use of a study which conceivably included sales as much as 15 months after the assessment was made is manifestly unfair and inequitable to the borough and its taxpayers and is rejected.
It is further noted that the unweighted ratio, which is derived from a mere one-year sales study, is subject to temporary market fluctuations and ascribes inordinate influence to inadequate sales samples in a single year. The Legislature recognized this when it changed the Chapter 123 ratio from a one-year, unweighted and unclassified ratio to the classified and weighted ratio, effective for 1979 and later years. See Committee Statement to Assembly Bill 1492, L.1979, c. 51. That new Chapter 123 ratio reflects sales over a period of years with a different weight assigned to each year on a multiple regression basis. The evident legislative design was to promote stability in assessments. Rudd v. Cranford, supra at 249.
In order for a taxpayer to prove discrimination, other than through the formula expressed in Chapter 123, he must prove not only that real property generally within the municipality was being assessed at less than true value, but also, that the assessment on his property, when compared to its true value, is at a substantially higher percentage than the common level percentage to the true value of all real property within the municipality. New Brunswick v. Tax Appeals Div., supra at 533, 544, 189 A.2d 702; Continental Paper Co. v. Ridgefield Park, 122 N.J.Super. 446, 300 A.2d 850 (App.Div.1973), certif. den. 63 N.J. 328, 307 A.2d 101 (1973).
Since all property within Englewood Cliffs was revalued for the 1978 tax year, there is a presumption that all property *212 was uniformly assessed at true value. Tri-Terminal Corp. v. Edgewater, 68 N.J. 405; 346 A.2d 396 (1975); Cantrell v. Upper Pittsgrove Tp., 1 N.J.Tax 508 (Tax Ct.1980). I find that the evidence was insufficient to overcome this presumption. This situation is not unlike that found in Newark v. Vernon Tp., 1 N.J.Tax 90 (Tax Ct.1980), aff’d 179 N.J.Super. 332, 432 A.2d 106 (App.Div.1981), where the court stated:
... Newark’s proofs consisted of a compilation of statistics assembled by the Director which are annually issued to promulgate the ratio of assessed value to selling price throughout the State’s taxing districts. Standing alone, these proofs are wholly inadequate to establish discrimination in terms of the decisional law developed in recent years in New Jersey. First and foremost, Newark failed to establish that, relative to the generality of other assessed real property in Vernon, its property was being assessed on a less favorable basis. This, among several other recent judicial prerequisites, must be established to accommodate the holding of the Supreme Court in Tri-Terminal Corp. v. Edgewater, 68 N.J. 405, 346 A.2d 396 (1975). Here, there is no indication that the value of Newark’s land did not rise during the years in question to the general extent and in the same proportion as that of all other taxpayers.... Moreover, there is the more important circumstance that Vernon completed a revaluation effective for the year 1973, the first year under appeal. Significantly, Newark made no claim for discrimination relief in that year. The close proximity of the latter two years to the revaluation year may, in itself, be sufficient to negate discrimination. To like effect, is the more recent decision of the Supreme Court in Piacataway Associates v. Piscataway, 139 N.J.Super. 276, 353 A.2d 542 (1976). [1 N.J.Tax at 106]
Taxpayer’s claim of discrimination for 1978 is rejected and thus, in capitalizing the 1978 income, the actual tax rate will be used as a component of the capitalization rate.
Taxpayer’s expert employed, what he termed, a weighted and/or hybrid band-of-investment building-residual technique in determining the interest (return on investment) portion of the capitalization rate. He assumed a 75%-25% mortgage-equity ratio with varying mortgage interest rates from year to year and a 12% return on equity for all years. As was the case with the 75%-25% ratio there was no support, other than his experience, for his assumed return of 12% on the mortgage portion. He estimated that the building had a remaining useful economic life of 40 years and thus postulated an annual rate of return (of investment) at 2.5%.
*213 He testified that his mortgage interest rates of 9%, 9.5% and 10% for 1978, 1979 and 1980, respectively, were based on the rates returned by alternate investments and on discussions with local lenders. He also relied on a bank’s offer of a mortgage loan to the owner of adjacent property made in 1976 with an interest rate of 9.5%. It is not clear if the offer was accepted and, if so, if the loan was ever consummated. I place no reliance on such offer. This offer of a mortgage loan is not unlike the unconsummated agreement to sell, a listing agreement and offers to sell addressed by Judge Lario in Olin-Mathieson Chemical Corp. v. Paulsboro Bor., 3 N.J.Tax 255 (Tax Ct.1981), where he stated:
The alleged agreement not having been reduced to a binding agreement of sale with all its terms and conditions being made known, is too remote and too speculative to be evidential of the value of the subject property; therefore no probative weight may be given to it.
Likewise, very little probative weight is ascribed to the listing agreement of $1,500,000 and the other two offers received thereunder. In the case of In re Port of New York Authority, 28 N.J.Super. 575, 101 A.2d 365 (App.Div.1953), the court stated:
It is the general rule that evidence of mere offers or options to sell or purchase similar real properties is not admissible. Essex County Park Comm. v. Brokaw, 107 N.J.L. 110, 150 A. 387 (E & A 1930); cf. Montclair R.R.Co. v. Benson, 36 N.J.L. 557 (E & A 1873). The reasons under setting the rule are expressed in Sharp v. United States, 191 U.S. 341, 24 S.Ct. 114, 48 L.Ed. 211 (1903); Erceg v. Fairbanks Exploration Co., 95 F.2d 850 (9 Cir., 1938). Offers to sell made by an owner of the lands to be taken and proximate in point of time might, perhaps, in some circumstances constitute admissions against interest.
Our Supreme Court has held that the probative weight attributable to offers differs from that of a consummated sale, stating in N.J. Turnpike Auth. v. Bowley, 27 N.J. 549, 143 A.2d 558 (1958):
Offers, especially oral ones, may be glibly made without serious intention or the required resources. The offeror may entertain contingencies and terms reserved for later serious discussion. The offeror is likely to be unavailable for examination as to his intentions, ability to perform or unusual motivations for seeking the property. The area for collateral inquiry is far broader than in the case of actual sales as is also the opportunity for collusion and fraud. For such reasons, the great weight of authority declines to accentuate the element of speculation which inevitably attends an inquiry into value. Even in jurisdictions where offers may be shown, proof would probably be required which is here lacking, at least in part. Thus in City of Chicago v. Harrison-Halsted Building Corp., 11 Ill.2d 431, 143 N.E2d 40, 45 (Sup.Ct.1957), the court laid down the test that the “offer must be made in good faith, by a man of *214 good judgment, acquainted with the value of the real estate and of sufficient ability to pay” in “cash.” [at 262-263]
Although I find taxpayer’s recapture rate of 2.5%, based on a remaining economic life of 40 years, to be fair and reasonable based on the age and condition of the structure and the demand for such office use in this market, as previously noted, his interest rates are fraught with unwarranted and unsupported assumptions particularly with respect to a 12% return on equity. There was not one shred of testimony in support of that rate. Similarly, I find no support for his use of a 75%-25% mortgage-equity ratio. Although he claimed to have relied on conversations with representatives of lending institutions with respect to interest rates no details were given. Much more than a-mere reference to such discussions is required for the court to accord such testimony any weight. While Evid.R. 56[5] has eased the expert’s testimonial burden, it has not eliminated the need for the expert to base his opinion on facts made known to the court.
Taxpayer’s expert, while stating that he also relied on studies made by national life insurance companies with respect to mortgage interest rates, once again failed to furnish any details thereof. However, even had the results of such study been detailed, without more, no weight could be attributed to them because such data is subject to considerable differences in interpretation. The information published by national organizations is not always drawn from properties which can be considered comparable to the subject. They may not account for locational difficulties extant in a particular community. The data may apply to properties that may not be typical of the properties involved in a local property tax proceeding. Such published material may be useful as a comparison check but it is not persuasive without a showing that the subject fits the same category. Murnick v. Asbury Park, 2 N.J.Tax 168 (Tax Ct.1981), rev’d on other grounds 187 N.J.Super. 455, 455 A.2d 504 (App. Div.1982).
*215 In developing his rate of capitalization, borough’s expert, for all years, utilized an interest rate of 9%, which “in his view” reflected the market. His recapture rate of 1.31% was based on an assumed holding period of ten years, at the end of which, he further assumed that the property would either be sold or refinanced. During the ten-year-holding period he accounted for depreciation (recapture) at the rate of 2% a year. Thus at the end of ten years, 80% of the building plus the land would remain. After deducting 9% for interest from the installment of .15582, necessary to amortize the entire investment, according to the witness, the balance of .06582 represented recapture. Based on the ten-year-holding period and 20% for depreciation the mathematical rate for capital recapture was determined to be 1.3164 (.06582 X 20%) thereby making his overall rate for each year, exclusive of a factor for taxes, .1031.
With respect to taxes, borough’s expert found the effective tax rate for each year to be 1.58 which he calculated by applying the average of the Chapter 123 ratios to the average of the actual tax rates for all years. His total capitalization rate was .1189.
As a eheek against this rate, he analyzed the five sales transactions upon which he relied in his comparable sales analysis, and, after dividing the estimated net income with respect to each property by the sales price, found the market capitalization rate to range from 7.71 to 9.84 and an average of 9.39. As previously noted these sales were rejected as not being representative of the market. Furthermore, the expert’s conclusions in arriving at his various rates for each sale were not supported by the testimony. Without any details, he assumed a square foot rental for each structure in order to produce a gross income from which he deducted assumed expenses (based on a percentage of gross income) to arrive at net income. See Rodwood Gardens, Inc. v. Summit, 188 N.J.Super. 34, 455 A.2d 1136 (App.Div.1982). Additionally, there is no support for his estimated rate of recapture nor is there any authority for averaging the Chapter 123 ratios as well as the resulting tax rates in order to find an overall tax rate. Where multiple years are under *216 appeal, that practice, in view of the strict Chapter 123 corridor limitations, could produce a result which would not be achieved if the tax rate component of the capitalization rate was calculated for each year.
From the evidence presented I conclude that buyers and sellers in this market for office buildings are paying and accepting a return of less than that testified to by taxpayer’s appraiser. Based on the adjustments previously made by the court as well as returns on alternative relatively risk-free investments and considering the general advance of interest rates as reflected by the testimony from the time of these sales to the period in question I find the rates of return to be as follows.
1978 1979 1980
Interest .0850 .0925 .0975
Recapture .0250 .0250 .0250
Tax Rate *[6] ,0168 0157 .0147
.1268 .1332 .1372
Based on these rates the values are established as follows.[7]
1978
Income available for capitalization $ 250,740
Income attributable to land ($716,800x.l018) 72,970
Income attributable to improvements $ 177,770
Value of improvements ($177,770 1268) Add land value 1,401,972 716,800
Total value $ 2,118,772
1979
Income available for capitalization $ 270,148
Income attributable to land ($768,000x1082) 83,098
Income attributable to improvements $ 187,050
Value of improvements ($187,050 .1332) 1,404,279
Add land value 768,000
Total value $ 2,172,279
*217 1980
Income available for capitalization $ 274,605
Income attributable to land ($819,200x.ll22) 91,914
Income attributable to improvements $ 182,691
Value of improvements ($182,691 .1372) 1,331,567
Add land value 819,200
Total value $ 2,150,767
The finding of true value for 1978 ($2,118,772) exceeds the original assessment ($2,115,600) by only $3,172, a de minimus amount. Bearing in mind that mathematical perfection in taxation is unattainable, In re Appeal of Kents, 2124 Atlantic Ave., Inc., 34 N.J. 21, 32, 166 A.2d 763 (1961), and that the appraisal of real property is not an exact science, The Appraisal of Real Estate, supra, the assessment will be affirmed. Likewise, because the ratio between the assessment and true value ($2,172,-279) is 97% which is within the Chapter 123 corridor, (the upper limit being 106%) the assessment for 1979 will also be affirmed. However a deduction is warranted for 1980 because the 98% assessment to true value ratio exceeds the 94% upper limit of the Chapter 123 corridor. The application of the Chapter 123 average ratio of 81% to the true value of $2,150,767 results in an assessable value of $1,742,121, (rounded to $1,742,100).
The Clerk of the Tax Court is directed to enter judgments as follows:
1978 1979 1980
Land $ 716,800 $ 768,000 $ 663,600
Improvement 1,398,800 1,347,600 1,078,500
Total $2,115,600 $2,115,600 $1,742,100

 Evid.R. 3 (Anno.1983).

N.J.S.A. 54:51A-6 (L.1946, c. 161, § 15 amended by L.1973, c. 123, § 2; L. 1979, c. 114, § 10; L.1983, c. 45, § 1), formerly N.J.S.A. 54:2-40.4.

N.J.S.A. 54:51A-6d. provides: The provisions of this section shall not apply to any proceeding to review an assessment of real property taken with respect to the tax year in which the taxing district shall have completed and put into operation a districtwide revaluation program approved by the Director of the Division of Taxation pursuant to P.L. 1971, c. 424 (C. 54:1-35.35 et seq.), or a reassessment program approved by the county board of taxation.

 In fact, in Mumick, we remanded, stating: “If the taxpayers’ ratio does not meet the Chapter 123 threshold, they should be afforded the opportunity to demonstrate error in the director’s calculations if they so desire,” [187 N.J.Super. at 463, 455 A.2d 504]
Obviously, if Chapter 123 is not the exclusive remedy to tax discrimination, the elements of proof for discrimination and excess of true value are not identical. Either the taxpayer or the district should be allowed to prove that a different average ratio or common level was proper. [190 N.J.Super. at 539, 464 A.2d 1156]

The expert used the terms “common level” and “average ratio” interchangeably. “The common ratio (level) signifies that the same standard or percentage of value is used in assessing each property in the district. It should not be confused with the average ratio achieved under the statutory equalization process. The application of the average ratio is only ‘the arithmetical mean of the varying percentages of true value applied by the local assessor in assessing properties in the taxing district.’ ” Passaic v. Botany Mills, 72 N.J.Super. 449, 457, 178 A.2d 657 (App.Div.1962); citations omitted.

Evid.R. 56 (Anno. 1983).

The actual tax rate is used in 1978; effective tax rates are used in 1979 and 1980.

No recapture rate is applied to land; it is not a wasting asset.