TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1st Fl.
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

June 4, 2019

Elsbeth J. Crusius, Esq.
Law Offices of Elsbeth J. Crusius, LLC
267 Summit Avenue
Hackensack, New Jersey 07601

David J. Yanotchko, Esq.
Florio Kenny Raval, LLP
125 Chubb Avenue
Suite 310-N
Lyndhurst, New Jersey 07071

      Re:    United Development of America LLC v. Paterson City
               Docket Nos. 001142-2014 and 012633-2016

Dear Ms. Crusius and Mr. Yanotchko:

This letter constitutes the court's opinion following trial of plaintiff, United Development of America LLC's ("United Development"), challenge to the 2014 and 2016 local property tax assessments on its improved property in Paterson City ("Paterson").[1]

For the reasons stated more fully below, the court affirms the 2014 and 2016 local property tax assessments.

---

[1] Trial also included docket number 007338-2017. However, because United Development failed to present any evidence during trial of the subject property's market value as of the October 1, 2016 valuation date, the court granted Paterson's motion, under R. 4:37-2(b), to dismiss the complaint as to docket number 007338-2017.

## I. Procedural History and Factual Findings

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony offered at trial.

Plaintiff is the owner of the real property and improvements located at 44-48 Ryle Avenue, Paterson, New Jersey. The property is identified on Paterson's municipal tax map as Block 801, Lot 16 (hereafter referred to as the "subject property").[2]

The subject property is a K-shaped, 1.94-acre lot, containing frontage along Ryle Avenue and Geering Lane (a/k/a Ryle Road). The subject property is located in Paterson's First Ward, in close proximity to the Great Falls National Historical Park and Paterson's downtown area. The subject property is bordered to the south and southeast by the Passaic River. Thus, the rear portions of the subject property slope downward toward the Passaic River.

The subject property contains "mill-style" industrial buildings, constructed in the early 1900's, consisting of approximately 44,495 square feet.[3] One of the buildings consists of three distinct segments, a front two and part three-story segment located on the corner of Ryle Avenue and Geering Lane, a middle one and part-two story segment located along Geering Lane, and a rear, narrower, one-story segment, running parallel to and set back from Geering Lane. Generally, the buildings were in a poor and run-down condition and were unoccupied as of the valuation dates involved herein.

---

[2] United Development acquired the subject property on September 19, 2013, from Wells Fargo Bank, NA for a reported consideration of $60,000.

[3] The expert's (as hereinafter defined) appraisal report and trial testimony was that only one three-part building was erected on the subject property. However, the expert's street-level and satellite photographs of the subject property and the expert's flood map and handwritten lot lines on the flood map depict that two separate buildings are erected on the subject property. Based on the trial record, the court is uncertain whether the 44,495 square foot measurement includes one or both buildings.

At trial, United Development offered testimony from a State of New Jersey Certified General Real Estate Appraiser, who was accepted by the court, without objection, as an expert in the field of property valuation (the "expert"). The expert prepared an appraisal report expressing his opinion of the true or market value of the subject property as of the October 1, 2013, and October 1, 2015 valuation dates. Paterson offered no testimony from any valuation professional.

As of each valuation date, the subject property's tax assessment, implied equalized value, and the expert's value conclusion is set forth below:

| Valuation date | Tax assessment | Average ratio of assessed to true value | Implied equalized value | Expert's concluded value |
|---|---|---|---|---|
| 10/1/2013 | $2,349,400 | 124.81%[4] | $2,349,400 | $120,000 |
| 10/1/2015 | $1,254,500 | 90.52% | $1,385,882 | $120,000 |

As of the valuation dates at issue, the subject property was located in Paterson's I-1 industrial zoning district, with permitted uses that included business or professional offices, dry cleaning establishments/laundromats, light industrial/manufacturing, wholesaling establishments, motor vehicle sales, business services, warehousing and storage, research laboratories, governmental offices, educational institutions, trade or technical schools, child care centers, public parks, public utility facilities, off-street parking facilities, and outdoor storage.[5] Thus, according to the expert, the subject property was a "legal conforming use of the site as is."

The expert further offered his opinion that approximately "75% - 80% of this lot is in the [Passaic River regulatory] floodway and the remaining 10% - 15% is in the AE flood zone. It just

---

[4] When the Chapter 123 ratio is greater than 100% and the original assessment exceeds the court determined fair market value, then the assessment will be the fair market value. See N.J.S.A. 54:51A-6(c).

[5] According to the expert, the subject property was located in Paterson's Great Falls Historic District Redevelopment Area from 1978 to 2008. In 2008, the redevelopment plan expired and the subject property reverted back to the I-1 industrial zoning district.

floods, that area of the city just floods. . . ." However, based on the court's review of the flood hazard map, testimony elicited from the expert during cross-examination, and the expert's handwritten schematic of the subject property's boundaries on the flood map, approximately 100% of the front building segment and approximately 75% of the middle building segment are located outside of the AE Special Flood Hazard Area. However, a small portion of the middle building segment is located in what the expert termed, the "150 year floodplain,"[6] and 100% of the rear building segment, and the entire second industrial building are located in the AE Special Flood Hazard area.[7]

## II.    Conclusions of Law

### A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998).

---

[6]  The court concludes that the orange highlighted section on the flood map referred to by the expert were the "[m]oderate flood hazard areas, . . . the areas between the limits of the base [100-year] flood and the 0.2-percent-annual-chance (or 500-year) flood." https://www.fema.gov/flood-zones (last visited May 30, 2019).

[7]  According to the expert, United Development listed the subject property for sale in 2013 with a real estate broker and received no purchase offers. However, the expert did not review the listing agreement, did not confer with the real estate broker, and did not know when the listing expired. Nonetheless, offers to sell and offers to rent are not evidence of market value. See Korvettes Home Furnishing Center v. Elmwood Park Borough, 1 N.J. Tax 287 (Tax 1980); Harrison Realty Corp. v. Town of Harrison, 16 N.J. Tax 375, 383 n.3 (Tax 1997), aff'd, 17 N.J. Tax 174 (App. Div.), certif. denied, 153 N.J. 213 (1998); Town of Irvington v. 1125-11127 Clinton Avenue Assocs., 5 N.J. Tax 420, 427 (Tax 1983).

4

A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

At the close of United Development's proofs, Paterson moved to dismiss these matters under R. 4:37-2(b), arguing that the expert's highest and best use conclusion was not sound and thus, the presumption of validity had not been overcome. The court denied the motion and placed a statement of reasons on the record. Without reciting those findings and conclusions, the court found that it must accord United Development all reasonable and legitimate inferences which can

be deduced from the evidence presented. If accepted as true, the opinions of value offered by United Development's expert raised debatable questions regarding the correctness of the subject property's local property tax assessments, requiring denial of the motion.

Nonetheless, concluding that the presumption of validity has been overcome does not equate to a finding that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15.

B. Highest and Best Use

In the court's pursuit to determine the true market value of the subject property, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1 of the pretax year. See Petrizzo v. Edgewater, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures v. Shrewsbury Bor., 2 N.J. Tax 541, 551 (Tax 1981). An indispensable element to the process of property valuation and to the determination of true market value is discerning a property's highest and best use. Ford Motor Co., 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b., 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992). See also General Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005). "For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in

6

the valuation process." Ford Motor Co., 10 N.J. Tax at 161.

The phrase highest and best use is defined as:

> The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. . . Alternatively, the probable use of land or improved property – specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.
>
> [Appraisal Institute, The Dictionary of Real Estate Appraisal, 93 (5th ed. 2010.]

The highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000). This requires an appraiser to "interpret[] the market forces that affect the subject property and identif[y] the use or uses on which the final opinion of value is based." Appraisal Institute, The Appraisal of Real Estate, 42 (14th ed. 2013). Thus, the highest and best use is not a static principle rather, it is "shaped by the competitive forces within the market where the property is located." Id. at 331. The highest and best use of a property may alter over time with a market that is in transition, or as a result of changes in the economic climate, zoning, or from the presence or lack of development. When engaging in a highest and best use analysis the appraiser must interpret "the market forces that affect the subject property and identify[] the use or uses on which the final opinion of value is based." Id. at 42.

However, determination of a property's highest and best use begins with the proposition that a property must be valued as it was used on the valuation date, and the party proposing an

alternate highest and best use bears the burden, by a fair preponderance of the evidence, of presenting evidence to support its position. Highview Estates v. Borough of Englewood Cliffs, 6 N.J. Tax 194, 200 (Tax 1983); Penns Grove Gardens, Ltd. v. Borough of Penns Grove, 18 N.J. Tax 253, 263 (Tax 1999); Ford Motor Corp., 10 N.J. Tax at 167; Clemente, 27 N.J. Tax at 269.

Here, the expert offered his opinion that the subject property's buildings cannot be rehabilitated and "are functionally obsolete, there is so much work that would have to go into this that it would be easier to tear down." The expert further expressed that because of the subject property's proximity to the Passaic River, "the flood aspect issue of this property is troublesome for any developer, because to get financing for it, you're going to have to build the site up, and to do that you're going to have to go through DEP regulations . . . So there are parts of the site that would have to be raised twenty feet and parts that would have to be raised ten feet to get above the flood zone."

Thus, although the expert reached the conclusion that it was legally permissible, and physically possible to "build an industrial facility, . . . in my opinion, it's not financially feasible to do that . . . the cost to build an industrial facility is going to be less than the value of the building after its built. . . ." Accordingly, the expert opined that the highest and best use of the subject property "As Vacant" would be "as industrial land, because outdoor storage is allowed there, there are plenty of contractors . . . that would utilize the site as a storage facility with no building. . . ."

Additionally, the expert concluded that due to the "dilapidated" condition of the subject property's buildings, the highest and best use "As Improved," would be to "tear down" the buildings and for the subject property "to remain as vacant industrial land, until a time that it becomes feasible, or there is a zoning change." In sum, the expert's concluded highest and best

use "As Improved," was demolition of the buildings and an interim use of the real property for outdoor storage.

Accordingly, the expert performed the sales comparison approach to attempt to discern a market value for the subject property, identifying seven vacant land sale transactions of properties with an offered highest and best use for outdoor storage, which he deemed comparable to the subject property.[8]

However, the court finds that critical aspects of the expert's highest and best use analysis suffer from flaws rendering his conclusions defective. The concluded highest and best use of an improved property should "maximize[] an investment property's value, consistent with the rate of return and associated risk." Ford Motor Co., 127 N.J. at 301. When performing a highest and best use analysis of improved property the appraiser should consider: "[(i)] maintain[ing] the improvements as is; [(ii)] cur[ing] items of deferred maintenance and retain[ing] the improvements; [(iii)] modify[ing] the improvements (e.g. renovate, modernize, or convert), or [(iv)] demolish[ing] the improvements." The Appraisal of Real Estate, at 43. However, "[f]or any of these options to be financially feasible, the change must add at least as much value to the property as it costs. In other words, the value after conversion, renovation, or alteration less the costs of the modification must be greater than or equal to the value of the property as is." Id. at 346-7 (emphasis added). For these reasons, The Appraisal of Real Estate cautions that, "demolition of improvements [is] . . . the most extreme form of modification to the current use of the property as improved." Ibid. Thus, before concluding that demolition of an improvement is

_____

[8] Cross-examination disclosed that the expert did not know whether outdoor storage was a legally permitted or conditional use in five of his seven comparable vacant land sale transactions. Moreover, the expert did not know what the conditions were imposed for conditional use as outdoor storage in any of the zoning districts.

the most appropriate course of action, an appraiser must gauge whether the property value "as improved is greater than the value of the site as though vacant less demolition costs." Ibid.

If the appraiser determines that the costs of renovating or rehabilitating existing improvements will contribute no less than an equal measure of value to the property, then the improvements need not be demolished. Conversely, if the improvements, as existing, modified, or renovated, will "no longer contribute to value, demolition and redevelopment of the ideal improvement would be economically supportable." Ibid. Succinctly stated, the "contributory value of the existing improvements and any possible alteration of those improvements are just as important in determining highest and best use and, by extension, in developing an opinion of the market value of the property." The Appraisal of Real Estate, at 337.

Here, the expert's highest and best use analysis was based on the assumption that none of the buildings on the subject property could be renovated or rehabilitated, and that it was more financially feasible to demolish the existing buildings and construct a new industrial building, between ten and twenty feet above the base flood elevation. In the expert's estimation, the cost of undertaking these actions would exceed the market value of the new industrial building to be built thereon. Accordingly, he concluded that demolishing the subject property's buildings and using the real property as an outdoor storage yard was its highest and best use.[9]

However, admittedly the expert did not conduct an interior inspection of any building on the subject property, and relied on no consulting, professional, or structural engineering, or architectural reports, studies, or analysis. Although the court readily appreciates that portions of

_____

[9] The court's review of the surface photographs contained in the expert's report disclosed that the rear segment of the building contained numerous broken windows, a partially collapsed roof, and overall, was in extremely poor condition. However, the front and middle segments of the building appeared to be in substantially better condition, containing red brick exterior walls and intact or wood covered windows and doors.

10

the subject property's buildings may have been inappropriate to enter without safety equipment, the expert did not solicit, nor attempt to solicit, advice or information from any firm or individual qualified to opine on the estimated costs to renovate the buildings, or any part thereof.[10] Thus, the expert did not possess any proposals, estimates, or reports, nor did he conduct any analysis of the estimated costs to renovate some or all of the subject property's buildings. Moreover, the expert did not possess, nor rely upon the reports of any qualified firm or individual in concluding that all the buildings on the subject property were unfit to be renovated, or rehabilitated. In sum, the expert lacked detailed, credible, and reliable information regarding whether any of the buildings on the subject property could be renovated or rehabilitated, and what the estimated costs were to renovate or rehabilitate the buildings. Significantly, the expert was unable to demonstrate how the renovation or rehabilitation costs would have directly affected the value of the subject property. As such, in conducting his financial feasibility test, he did not, and was unable to offer credible and reliable testimony that the costs for renovating or rehabilitating the subject property's existing improvements will contribute no less than an equal measure of value to the property. The analysis of the feasibility of renovation, rehabilitation, or modification involves a "straightforward comparison of the contributory value of the change with the cost of making the change." The Appraisal of Real Estate, at 347. The appraiser must analyze the "costs of curing physical deterioration or functional obsolescence, . . . or converting the existing improvements into an alternative use . . . [in contrast with] the value created in the market." Id. at 348.

---

[10] The expert offered testimony that after completion of his appraisal report and prior to trial he conducted an exterior inspection of the subject property with a business associate, who was also a developer, to ascertain if his estimated cost for demolition of the buildings was accurate. No testimony was offered regarding the developer's background, skill, or knowledge, or whether the developer offered any opinion regarding the estimated costs for renovation or rehabilitation.

11

By way of example, had a qualified firm or individual determined that some or all of the subject property's buildings could be renovated or rehabilitated, the expert would have been able to weigh the costs associated with renovation versus reconstruction. The expert could have also determined whether the costs of renovation would have contributed at least an equal measure of value to the subject property. Conversely, had his analysis demonstrated that the cost to renovate or rehabilitate all or some of the buildings would have contributed a less than equal measure of value to the subject property, then demolition and redevelopment may have be a justifiable alternative. Moreover, the expert would also have been in a position to appropriately measure if those expenditures offered a maximally productive use of the subject property.

Additionally, in estimating the construction costs of a new industrial building on the subject property, the expert concluded that it would have to be raised between ten and twenty feet above the real property as it presently exists. However, the expert did not review a flood elevation certificate for the subject property. Instead, the expert's conclusion was based solely on his inaccurate review of the published flood map, which the court previously highlighted disclosed that approximately 100% of the front building segment and approximately 75% of the middle building segment are located outside of the AE Special Flood Hazard Area. Thus, the court is uncertain whether the expert's estimated costs for construction of a new industrial building on the subject property, in determining a highest and best use, were accurate.

When offering opinion testimony, an expert must "give the why and wherefore" of his or her opinion, rather than a mere conclusion." Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002) (quoting Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div.), certif. denied, 145 N.J. 374 (1996)). "As construed by applicable case law, N.J.R.E. 703 requires that an expert's opinion be based on facts, data, or another expert's opinion, either perceived by or made

12

known to the expert, at or before trial." Ibid. The bare conclusions of an expert, unsupported by factual evidence and data will not withstand judicial scrutiny. See State v. Townsend, 186 N.J. 473, 494-495 (2006).

Here, the expert was qualified by the court as an expert in real property valuation, thereby permitting him to offer opinion testimony. The expert's highest and best use analysis was premised on assumptions about the interior condition of buildings that he did not inspect, that the buildings on the subject property could not be renovated, and that any newly constructed industrial building on the subject property would need to be raised to meet base flood elevation requirements. However, the expert did not possess, nor rely upon the estimates, or reports of any consultant, engineer, or architect in concluding that all the buildings on the subject property were unfit to be renovated or rehabilitated. Thus, the expert offered nothing more than bare and unsubstantiated conclusions that it was not possible to renovate or rehabilitate the existing buildings, and that it was necessary to demolish and reconstruct a new industrial building on the subject property. As a result, the expert's highest and best use analysis failed to adequately address and consider all of the financially feasible uses for the subject property and its improvements. These deficiencies render the expert's highest and best use analysis fatally flawed.

Finally, although the expert offered testimony during cross-examination that he considered other legally permissible uses, including professional offices, research laboratories, public buildings, educational facilities, self-storage, and warehouses, he included no analysis of these uses, nor the market demand for these uses in his appraisal report, or in his testimony before the court. Significantly, the expert admitted that he did not reach any value conclusion for the subject property when considering any other legally permitted use. However, without having analyzed the cost to renovate or rehabilitate existing buildings, the demand in the marketplace for other

13

legally permitted uses, and the market value of the improvements after renovation for another legally permissible uses, the court questions how the expert was able to reach his highest and best use conclusion. When the physically possible and legally permissible uses are income-producing, the financial feasibility analysis should "focus on which potential uses are likely to produce an income (or return) equal to or greater than the amount needed to satisfy operating expenses, financial obligations, and capital amortization of the investment." The Appraisal of Real Estate, at 341. Moreover, when the physically possible and legally permissible uses are not income-producing, "financial [feasibility] analysis will determine which uses are likely to create a value or result in a profit equal to or greater than the amount needed to develop and market the property under those uses." Ibid. However, for any alternative use, "the cost of construction (including an estimate of entrepreneurial coordination) and the expected value of the specific property use should be known." Id. at 342 (emphasis added). Here, the expert did not know the estimated costs for renovation and more importantly, did not make any determination of what the potential value of the subject property would have been under those alternative uses.

For the above-stated reasons, the court rejects the expert's conclusion that the highest and best use of the subject property, as vacant, and as improved, is demolition of the buildings and use of the real property for outdoor storage.

Additionally, because all seven of the vacant land sales identified and relied on by the expert had a highest and best use for outdoor storage purposes, the court must reject the expert's vacant land sales as being not comparable to and competitive in the marketplace with the subject property, and thus, not representative of the subject property's true value for the 2014 and 2016 tax years.

C. The Glen Wall dilemma

Nonetheless, the court is mindful of its obligation "to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Assocs. v. Wall. Twp., 99 N.J. 265, 280 (1985) (citing New Cumberland Corp. v. Roselle Borough, 3 N.J. Tax 345, 353 (Tax 1981)). In "considering an expert's evidence a court should be cognizant of the expense incurred by litigants in engaging an expert. Therefore, the volume of information that is required to support an expert's opinion must be kept within practical and realistic limits." Glen Wall Assocs., 99 N.J. at 280.

Here, the court recognizes the wide disparity that exists in the subject property's equalized fair market value between the 2014 and 2016 tax years. The court is further mindful that taxpayers have a right to "equality of treatment in sharing the duty to pay real estate taxes." West Milford Twp. v. Van Decker, 120 N.J. 354, 360-361 (1990) (quoting Murnick v. Asbury Park, 95 N.J. 452, 458 (1984)). See also Regent Care Center, Inc. v. Hackensack City, 362 N.J. Super. 403, 415 (App. Div. 2003).

However, to enable the court to make a credible, independent finding of true value, and thereby ensure an equality of treatment and sharing of the local property tax burden, cogent and competent evidence must be adduced in the trial record. "[A]n expert should fully document his opinion. . . [and the] expert's duty to do so must never be compromised." Glen Wall Assocs., 99 N.J. at 280. Nevertheless, the court's independent determination of value must be based "on the evidence before it and the data that are properly at its disposal." F.M.C. Stores Co. v. Morris Plains Borough, 100 N.J. 418, 430 (1985).

Here, the court concludes that due to the deficiencies recited herein, the expert's appraisal report and testimony before the court contains insufficient credible information to enable the court

15

to make an independent finding regarding the true market value of the subject property as of the October 1, 2013 and October 1, 2015, valuation dates.

### III. Conclusion

Accordingly, for the above-stated reasons, the court will enter judgments affirming the subject property's 2014 and 2016 local property tax assessments.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.