## TAX COURT OF NEW JERSEY



**Joshua D. Novin**
**Judge**

**Court & Washington Streets**
**P.O. Box 910**
**Morristown, New Jersey 07963-0910**
**Tel: (973) 656-3931 Fax: (973) 656-4305**

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

April 3, 2017

Salvatore Perillo, Esq.
Nehmad Perillo & Davis, P.C.
4030 Ocean Heights Avenue
Egg Harbor Township, New Jersey 08234

Stanley L. Bergman, Jr., Esq.
Bergman Law Offices, PA
3120 Fire Road, Suite 202
Egg Harbor Township, New Jersey 08234

> Re:     Trocki Hotels LP v. Egg Harbor Township
> Docket Nos. 014920-2010, 006657-2011 and 003246-2012
>
> I & S Associates LLC v. Egg Harbor Township
> Docket Nos. 014921-2010, 013381-2011 and 013551-2012

Dear Mr. Perillo and Mr. Bergman:

This letter constitutes the court's opinion following trial of local property tax appeals filed by plaintiffs, Trocki Hotels LP and I & S Associates LLC. Trocki Hotels LP and I & S Associates, LLC challenge the 2010, 2011 and 2012 local property tax assessments on their improved and vacant property in Egg Harbor Township ("defendant"), Atlantic County, New Jersey.

For the reasons stated more fully below, the court reduces the 2010, 2011 and 2012 tax year local property tax assessments.

## I. Procedural History and Findings of Fact

Trocki Hotels, LP ("Trocki Hotels") is the owner of the real property and improvements located at 7095 Black Horse Pike, Egg Harbor Township, Atlantic County, New Jersey. Trocki Hotels is owned by Ira M. Trocki, M.D. ("Dr. Trocki") and his wife. The property is identified on the tax map of Egg Harbor Township as Block 4305, Lot 1 (the "Trocki property"). For the 2010, 2011 and 2012 tax years, the Trocki property was assessed as follows:

Land: $ 754,500
Improvement: $2,993,800
Total: $3,748,300

I & S Associates LLC ("I&S Associates") is the owner of the adjoining vacant real property located at 7099 Black Horse Pike, Egg Harbor Township, Atlantic County, New Jersey. Dr. Trocki owns a majority and controlling ownership interest in I&S Associates. The property is identified on the tax map of Egg Harbor Township as Block 4305, Lot 2 (the "I&S property"). For the 2010, 2011 and 2012 tax years, the I&S property was assessed as follows:

Land: $321,800
Improvement: $ 0
Total: $321,800

The Chapter 123 ratio and common level range for Egg Harbor Township was as follows:

|  | 2010 | 2011 | 2012 |
|---|---|---|---|
| Average Ratio | 51.06 | 54.17 | 57.87 |
| Lower Limit | 43.40 | 46.04 | 49.19 |
| Upper Limit | 58.72 | 62.30 | 66.55 |

When the average ratio is applied to the Trocki property's local property tax assessment, it has an implied equalized value of $7,340,971.40 for the 2010 tax year, $6,919,512.60 for the 2011 tax year and $6,477,103.80 for the 2012 tax year. When the average ratio is applied to the

2

I&S property's local property tax assessment, it has an implied equalized value of $630,238.93 for the 2010 tax year, $594,055.75 for the 2011 tax year and $556,073.95 for the 2012 tax year.

Trocki Hotels and I&S Associates shall be collectively referred to herein as "plaintiffs."

###### a. The Trocki property

The Trocki property is an irregularly-shaped 3.45 acre lot, containing approximately 352 feet of frontage along the south side of Black Horse Pike, a four-lane macadam state road, and 631 feet of frontage along Fox Place. The Trocki property is located approximately 2½ to 3 miles west of Atlantic City. The site is serviced by public and private utilities including electric, natural gas, water and sanitary sewer.

The Trocki property is improved with a two and part three-story 68,985 square foot masonry and steel structure, containing a Travelodge motel consisting of 197 guest rooms, each equipped with a three fixture bathroom and individual electric heat and air conditioning units. The 197 guest rooms consist of 194 one-bedroom suites and 3 two-bedroom suites. The motel was constructed in or about 1986. The Travelodge is a limited service motel providing only restricted dining and beverage service. The Travelodge affords guests interior corridor access to guest rooms, an elevator, laundry services, "free high speed internet," a continental breakfast, parking for automobiles and trucks, use of "privately owned Bayside Beach," "bayview rooms," and an in-ground outdoor swimming pool and deck overlooking Lakes Bay.[1]

During the years at issue, the Travelodge was managed by Piccasso's, Inc., a corporation owned by Dr. Trocki and his wife. In addition to managing the Travelodge, Piccasso's, Inc. served as manager for two other lodging facilities owned by Dr. Trocki, the Holiday Inn Express

---

[1] Conflicting testimony was presented to the court with respect to the presence of an outdoor in-ground pool. Plaintiff's appraiser included in his appraisal report a photograph of an outdoor area which he labeled "Pool Area" and the brochure for the Travelodge, included in defendant's appraisal report, includes a photograph of an outdoor pool and states "[o]utdoor seasonal pool." However, during cross-examination defendant's appraiser offered testimony that there is no swimming pool on the subject property.

3

and Clarion Hotel and Convention Center, both located on Black Horse Pike in Egg Harbor Township, New Jersey. A management agreement apparently exists between Piccasso's, Inc. and Trocki Hotels for management of the Travelodge, however, a copy of such agreement was not provided to the court.

b. The I&S property

The I&S property is an irregularly-shaped, 2.81 acre principally vacant lot, containing approximately 297 feet of frontage along the south side of Black Horse Pike. The I&S property abuts the easterly lot boundary of the Trocki property and provides an alternate means of vehicular ingress and egress from Black Horse Pike to the Travelodge motel.

The Trocki property and I&S property shall be collectively referred to as the "subject property" or "subject properties."

Located immediately to the rear of the subject properties is Lakes Bay, a 27-acre nature preserve, containing a mixture of saltwater marshes, bayberry thickets and beaches, which serves as a habitat for several local wildlife species. Lakes Bay also serves as a recreational area for individuals wishing to partake in several non-motorized water sports, including windsurfing, board-sailing, paddle boarding and kayaking.[2] The Trocki property and I&S property attach to form a horseshoe shape with the rear of the horseshoe bordering Black Horse Pike and the prongs of the horseshoe extending towards Lakes Bay. Due to the subject properties' proximity to Lakes Bay, they are located in Special Flood Hazard Area Zone A5, which denotes an area within the 100-year floodplain. According to Dr. Trocki, a gabion was erected along the subject properties boundary with Lakes Bay to protect it from tidal flooding. Nonetheless, areas of the subject property have experienced periodic flooding from Lakes Bay during significant storm events and high tide.

---

[2] www.njconservation.org/lakesbayperserve.htm

The subject properties are located in the R-5 Apartment Residential Zone district with permitted uses including garden apartments, townhomes, single-family dwellings and Planned Unit Developments for both residential and nonresidential uses. Commercial, motel and commercial recreational uses are permitted in the R-5 Apartment Residential Zone as Planned Unit Developments, however, such use requires a minimum land area of fifty acres. The use of the Trocki property as a motel precedes adoption of the current zoning ordinances and, therefore, is a pre-existing, legally permitted, non-conforming use.

Due to its close proximity to Atlantic City, the subject property and its environs was developed as a secondary market to Atlantic City. There, consumers could find lower cost alternatives to higher priced Atlantic City motels and hotels. However, with the development and expansion of casino gaming in Connecticut, New York and Pennsylvania, Atlantic City's monopoly on East Coast gaming began to erode. See Marina Dist. Development Co., LLC v. City of Atlantic City, 27 N.J. Tax 469, 476 (Tax 2013). This erosion, plaintiffs' maintain, caused the continued operation of the Travelodge to become increasingly challenging.

Plaintiffs brought petitions of appeal before the Atlantic County Board of Taxation (the "Board") challenging: (i) the 2010 tax year local property tax assessments on the subject properties; and (ii) the 2011 and 2012 tax year local property tax assessments on the I&S property. The Board entered Memorandum of Judgments (the "Judgments") for each year denying plaintiffs' claims for relief under judgment code "6B" – "Hearing waived." Plaintiffs' filed timely Complaints with the Tax Court contesting the Judgments. In addition, Trocki Hotels filed direct appeals with the Tax Court challenging the 2011 and 2012 tax year local property tax assessments on the Trocki property. The defendant did not file Counterclaims.

5

During trial, testimony was offered by plaintiffs' owner, Dr. Trocki. Dr. Trocki acquired the Travelodge in late 2003 for the sum of $5,500,000. Dr. Trocki explained that, in the years following acquisition of the Travelodge, with the loss of government groups and private contracts, coupled with the decline of the Atlantic City gaming and hotel market, the Travelodge began to experience a decline in revenues. The Travelodge is located near several newer motels, including a Hampton Inn, Residence Inn and Comfort Inn, which directly compete for motel patrons. In addition, several older and smaller wood-frame motels with less savory reputations exist in proximity to the Travelodge. Moreover, because of its location, approximately one mile west of the exit and entrance to the Atlantic City Expressway, Dr. Trocki expressed that accessing the Travelodge is sometimes difficult for motel patrons. However, Dr. Trocki testified that he kept the Travelodge open because, in his opinion, the cost of continuing to operate the motel would equal the costs associated with closing it.

According to Dr. Trocki, the Travelodge "flag" ranks towards the bottom of limited service chain motels and therefore derives one of the lowest daily room rates on a national basis. In Dr. Trocki's opinion, the national average daily room rate for Travelodge flag motels is approximately $35.00 to $40.00 per night.

Dr. Trocki further testified that, as of the date of trial, he owned a Holiday Inn Express motel, located approximately three miles from the Travelodge in Egg Harbor Township. The Holiday Inn Express also contains 197 guest rooms. Although Dr. Trocki observed that as of the valuation dates economic conditions were less than favorable, he expressed that occupancy at his Holiday Inn Express remained relatively stable.

Dr. Trocki gave some consideration to selling the subject property or converting it into condominium units, when K. Hovnanian began to develop the immediately adjacent property

into a 131 unit townhome development. However, according to Dr. Trocki, after the well-documented economic downturn in late 2007, it was no longer financially feasible to develop the subject property into condominiums. Dr. Trocki did not formally list the subject properties for sale on any multiple listing services because doing so would have negatively impacted his ability to continue to market the Travelodge to prospective guests, but he quietly continued to field offers and gauge interest from prospective developers concerning the subject property.

In addition to Dr. Trocki's testimony, at trial, plaintiffs and defendant each offered testimony from a State of New Jersey certified general real estate appraiser, who were accepted by the court, without objection, as experts in the property valuation field.

In the opinion of plaintiffs' appraiser, the highest and best use of the Trocki property and I&S property was for single-family residential development. Accordingly, plaintiffs' appraiser prepared two appraisal reports, each one expressing a separate opinion of the true market value of the Trocki property and I&S property as a single-family residential development for each tax year at issue.

Conversely, defendant's appraiser concluded that the highest and best use of the subject property is continuation of the existing use as a motel. Defendant's expert prepared one appraisal report, concluding that the subject properties "are joined in a Unity of Use and Value of the Travelodge on Lot 1 [and] cannot be separated from Lot 2." In the opinion of defendant's appraiser, the I&S property "has no independent value and should simply be allocated from the value estimate for the Travelodge."

The appraisers offered their opinions that the Trocki property and I&S property had a true market value as follows:

7

|  | October 1, 2009 | | October 1, 2010 | | October 1, 2011 | |
|---|---|---|---|---|---|---|
|  | Trocki property | I&S property | Trocki property | I&S property | Trocki property | I&S property |
| Plaintiffs' Appraiser | $160,000 | $130,000 | $140,000 | $120,000 | $130,000 | $110,000 |
| Defendant's appraiser | $6,129,000 | | $6,129,000 | | $6,129,000 | |

Thus, the court faces the task of resolving not only the appraisers' differing approaches to value the subject properties, but also attempting to reconcile the appraisers' widely disparate conclusions of value.

## II.     Conclusions of Law

### a.     Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)). "The presumption of correctness. . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Township v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which

can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000), certif. denied, 165 N.J. 488 (2000)). "Only after the presumption is overcome with sufficient evidence. . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)). Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the plaintiff has overcome the presumption of validity. If the court independently concludes that plaintiff has not carried the requisite burden, dismissal of the action is warranted under R. 4:40-1 and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

According plaintiffs all reasonable and legitimate inferences which can be deduced from the evidence presented, the court concludes that plaintiffs produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of plaintiffs' appraiser and the facts upon which he relied raise debatable questions regarding the correctness of the local property tax assessments on the subject properties for the 2010, 2011 and 2012 tax years.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on

behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer. . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., supra, 100 N.J. at 413).

b. Highest and Best Use and Market Analysis

In the court's pursuit to determine the true market value of the subject property, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1 of the pretax year. See Petrizzo v. Edgewater, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures v. Shrewsbury Bor., 2 N.J. Tax 541, 551 (Tax 1981). An indispensable element to the process of property valuation and to the determination of a property's true market value is discerning its highest and best use. Ford Motor Co. v. Township of Edison, 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b., 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992). See also General Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005). "For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." Ford Motor Co., supra, 10 N.J. Tax at 161.

The phrase highest and best use is defined as follows:

> The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. . . Alternatively, the probable use of land or improved property –

10

specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.

[Appraisal Institute, The Dictionary of Real Estate Appraisal (5th ed. 2010).]

Thus, the highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000).

The determination of a property's highest and best use begins with the proposition that a property must be valued as it was used on the valuation date, and the party proposing an alternate highest and best use bears the burden, by a fair preponderance of the evidence, of presenting evidence to support its position. Highview Estates v. Borough of Englewood Cliffs, 6 N.J. Tax 194, 200 (Tax 1983); Penns Grove Gardens, Ltd. v. Borough of Penns Grove, 18 N.J. Tax 253, 263 (Tax 1999); Ford Motor Corp., supra, 10 N.J. Tax at 167; Clemente, supra, 27 N.J. Tax at 269.

However, the highest and best use of a property is not a static principle. The highest and best use of a property may alter over time with a market that is in transition, or as a result of changes in the economic climate, zoning, or from the presence or lack of development. When engaging in a highest and best use analysis the appraiser must interpret "the market forces that affect the subject property and identify[] the use or uses on which the final opinion of value is based." Appraisal Institute, The Appraisal of Real Estate, 42 (14th ed. 2013).

The highest and best use of a property "is not determined through subjective analysis. . . rather, highest and best use is shaped by the competitive forces within the market where the property is located. . . the [market] analysis and interpretation of highest and best use is an economic study of market forces focused on the subject property." Entenmann's Inc., supra, 18 N.J. Tax at 545; see also Clemente, supra, 27 N.J. Tax at 267-269. Market analysis is defined as a "study of market conditions for a specific type of property." Appraisal Institute, The Appraisal of Real Estate, 41 (14th ed. 2013). Market analysis is pivotal in the appraisal process, because it offers an understanding of the predominant market conditions that exist, against which proposed local developments will be measured. It also offers meaningful insight into matters of supply and demand in the marketplace and how property values may change over a period of time. Embedded in that analysis is the concept of value in exchange, i.e. the selected use "must be a probable use for which there must be a demand in the relevant market." WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610, 616 (Tax 1985). An appraiser's highest and best use analysis must not be grounded upon the value in use of a property, i.e. the value a property may have for its specifically designed purposes, because that use may not reflect true market value. A property "should be examined for all possible uses and that use which will yield the highest return should be selected." General Motors Corp., supra, 22 N.J. Tax at 125 (quoting Owens-Illinois Glass Co. v. Bridgeton, 8 N.J. Tax 495 (Tax 1986)).

c. Plaintiffs' Approach to Value

In the opinion of plaintiff's appraiser, the highest and best use of the subject properties was for development of single-family dwellings. However, plaintiffs' appraiser did not value the subject properties as one cohesive unit, instead electing to value the Trocki property and I&S property separately, relying upon the sales comparison approach.

Plaintiffs' appraiser's "As Improved" highest and best use analysis began with his review of the Travelodge's audited income and expense statements for the years ending 2008, 2009, 2010, 2011 and 2012. The reproduced abstract of the Travelodge's operating revenues and expenses set forth in plaintiffs' appraisal report revealed that plaintiffs' gross revenues were $1,172,921 for the 2008 calendar year; $579,118 for the 2009 calendar year; $776,195 for the 2010 calendar year; $836,663 for the 2011 calendar year; and $960,304 for the 2012 calendar year. However, exclusive of real estate taxes, plaintiffs' operating expenses for the 2009, 2010 and 2011 years exceeded gross revenue, resulting in operating losses between $37,302 and $225,867. Therefore, in plaintiffs' appraiser's opinion, the Travelodge was "unprofitable" and no longer economically viable as a motel. Accordingly, plaintiffs' appraiser attributed no value to the Travelodge motel and posited that the motel should be demolished, estimating demolition costs to be $275,000 or $4.00 per square foot. However, because the demolition costs exceeded plaintiffs' appraiser's concluded fair market value, his "As Improved" highest and best use of the Trocki property was to "Hold for Development."

In conducting his "As Vacant" highest and best use analysis for the subject properties, plaintiffs' appraiser reached a different result, concluding that the "As Vacant" highest and best use of the subject properties was for "single family residential development." Plaintiffs' appraiser reached this conclusion by first examining the permitted density of apartments and townhomes in the R-5 Residential Apartment Zone, which he opined was limited to 12 units per acre.[3] In plaintiffs' appraiser's opinion, "townhome land sells for more than apartment land on a per unit basis, so townhomes are considered to be the higher and better use." However,

_____

[3] Although the R-5 Apartment Residential Zone § 225-34 reproduced in the Addenda to plaintiffs' appraisal report reflects a maximum density for residential townhomes and for planned unit developments of 12 units per acre, the section of the ordinance which identifies the maximum density for multi-family residential apartments was not reproduced.

plaintiffs' appraiser offered no market data, surveys or evidence during trial or in his appraisal reports supporting such bare conclusion.

Plaintiffs' appraiser next expressed that between 2009 and 2012, sales of multi-family apartment units in Atlantic County sold in the range of $25,000 to $64,000 per unit. Therefore, plaintiffs' appraiser concluded that development of the subject properties for multi-family apartment units was not financially feasible. Yet, plaintiffs' appraiser offered the court no data, reports, or construction cost information for multi-family residential apartment units. Moreover, no evidence was offered by plaintiffs' appraiser regarding the location, quality, composition or the effective age of the multi-family apartment unit sales that he examined to form his conclusion.

However, because plaintiffs' appraiser concluded that townhomes would "sell for considerably more per unit," than multi-family residential apartment units, he surveyed the feasibility of developing the subject properties as townhomes. Plaintiff's appraiser estimated that approximately 40 townhouse units could be constructed on the Trocki property and 33 townhouse units could be constructed on the I&S property. Plaintiffs' appraiser then consulted the Marshall & Swift valuation manuals to compute the estimated construction costs of Class D wood frame townhomes, which he concluded would be $105.07 per square foot.

According to plaintiffs' appraiser, the median sale price of townhomes between October 1, 2009 and February 2014, in the immediately adjacent K. Hovnanian townhome development, was $189,900, or $92.00 per square foot. Therefore, plaintiffs' appraiser concluded that redevelopment of the subject properties into townhomes was not financially feasible. Although plaintiffs' appraiser presented the court with a scatter plot chart indicating the range of sale prices in the adjacent townhome development, no detailed information was furnished to the court

14

by plaintiffs' appraiser identifying the property location, date of sale, sale price, interior finishes and square footage of each townhome unit.

Thus, in plaintiffs' appraiser's opinion, "[t]he only remaining use permitted is single family development. . . so that is what guided me in my search for comparable sales" and in concluding that the maximally productive use of the subject properties "As Vacant," was as a single-family residential development. However, plaintiffs' appraiser did not consider or analyze the costs associated with subdividing the subject property and constructing single-family homes. Moreover, plaintiffs' appraiser gave no consideration to the fact that the subject properties are located in a flood hazard area nor how that might impact the use of the subject properties for single-family residential development. The proposed highest and best use must be legally permissible, physically possible, financially feasible and maximally productive. Clemente, supra, 27 N.J. Tax at 267. Here, plaintiffs' appraiser conducted no analysis of the financial feasibility of subdividing and redeveloping the subject property into single-family homes, much the same way he considered redeveloping the subject property into townhomes. In fact, plaintiffs' appraiser conceded during trial that due to market conditions, "there wasn't much [residential] development going on at all in this time frame."

Moreover, in attempting to offer support for an explanation of his market adjustments, plaintiffs' appraiser concluded that the median sales price of single-family dwellings in Egg Harbor Township declined during 2009, 2010 and 2011 at rates of -7.2%, -10.9%, and -2.2% per year respectively, or in the aggregate -20.3% over the three year period. Thus, a proposed highest and best use that advocates for redevelopment of the subject properties into single-family dwellings would seemingly conflict with the existing market conditions, and casts doubt on the maximally productive use and financial feasibility of plaintiffs' appraiser's proposed highest and

15

best use. A prudent and circumscribed market analysis is pivotal to, and serves as a framework for, understanding the conditions which exist and shape the highest and best use of a property.

In conducting his sales comparison approach, plaintiffs' appraiser identified five land sales he considered comparable to the subject property. One land sale was located in Atlantic County and the remaining four land sales were located in Ocean County. The five land sales are set forth below:

| Sale | Address | Lot Size | Sold with Approvals | Zoning/ Minimum lot size | Sale date | Sale price/ price per acre |
|---|---|---|---|---|---|---|
| #1 | 26143 Mill Road Egg Harbor Township, NJ Atlantic County | 6.74 acres | Yes. Two lot subdivision for drug rehabilitation facility. | RG-1, Residential 30,000 sq ft lot | 11/22/2011 | $292,500/ $43,398 |
| #2 | Miro Avenue Barnegat, NJ Ocean County | 14.52 acres | No. Old residential subdivision existed. Buyer seeking approval for 24 lots. | R20 Residential 20,000 sq ft lot | 6/24/2011 | $600,000/ $41,322 |
| #3 | Gudz Road Lakewood, NJ Ocean County | 19.98 acres | Yes. Approvals granted for 37 lots. | R-12 Single-Family Residential 12,000 sq ft lot | 9/14/2010 | $2,450,000/ $122,623 |
| #4 | Radio Road Little Egg Harbor, NJ Ocean County | 46.85 acres | Yes. Approvals granted for 73 lot subdivision. | R-100 Residential 10,000 sq ft lot | 3/2/2010 | $3,500,000/ $74,707 |
| #5 | 1113 Church Road Toms River, NJ Ocean County | 6.34 acres | No. | R-200 Residential | 9/10/2009 | $550,000 $86,751 |

After identifying the land sales, plaintiffs' appraiser made a series of adjustments to account for perceived differences in time, location, approvals and lot size.

In computing his time adjustment, plaintiffs' appraiser computed the median sales price of single-family dwellings sold in Egg Harbor Township during the period from 2008 to 2013. Based upon this analysis, he concluded that a downward sales price trend existed in Egg Harbor Township for single-family dwellings during the 2009, 2010 and 2011 years. Plaintiffs' appraiser calculated a percent change, per year, of -7.2% for the 2009 tax year, -10.9% for the

16

2010 tax year and -2.2% for the 2011 tax year. Plaintiffs' appraiser then applied the computed percentage on a per year and per month basis to each of the five land sales.

In addition to his time adjustments, plaintiffs' appraiser adjusted land sales three and five downward 10% for location in each tax year, because in his opinion, they are in "superior Ocean County locations." Plaintiffs' appraiser further opined that a downward adjustment of 25% was warranted to land sales one, three and four, for each tax year, because they were sold with subdivision approvals and no subdivision approvals for the subject properties were undertaken. Finally, in plaintiffs' appraiser's opinion, larger single-family dwelling lots sell for more than smaller single-family dwelling lots, and because the minimum single-family dwelling lot size for the subject property would be 10,000 square feet, he adjusted land sales one, two and four downward by 10% to account for differences in lot size.

The range of adjusted sale prices of the five comparable transactions, per acre of land, was as follows: (i) $32,400 to $87,675 for the 2010 tax year; (ii) $29,619 to $79,705 for the 2011 tax year; and (iii) $28,208 to $75,719 for the 2012 tax year. Plaintiffs' appraiser then attributed the highest degree of weight, 60%, to land sale one and attributed 10% weight to land sales two, three, four and five. Ultimately, plaintiffs' appraiser concluded an estimated value per acre of $45,169 for the 2010 tax year, $41,053 for the 2011 tax year and $39,065 for the 2012 tax year. Plaintiff's appraiser then applied those concluded values to the Trocki property's 3.45 acres, and to the I&S property's 2.81 acres. Plaintiffs' appraiser's final concluded value for the Trocki property was: $160,000 for the 2010 tax year, $140,000 for the 2011 tax year and $130,000 for the 2012 tax year. Plaintiffs' appraiser's final concluded value for the I&S property was: $130,000 for the 2010 tax year, $120,000 for the 2011 tax year and $110,000 for the 2012 tax year.

17

It is well-settled that a witness who has been qualified by the court as an expert is permitted to offer opinion testimony. N.J.R.E. 702. However, the weight to be accorded expert testimony shall hinge "upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation (citation omitted). If the bases for the adjustments are not made evident the court cannot extrapolate value." Inmar Associates v. Edison Township, 2 N.J. Tax 59, 66 (Tax 1980). Although the facts or data relied upon by the expert need not be admissible, the testimony must nonetheless be rooted in facts, science, data or the opinions of other experts. N.J.R.E. 703. Thus, in order for the opinion of an expert to be of any import, the expert is required to "identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992). "Without explanation as to the basis, the opinion of the expert is entitled to little weight. . ." Dworman v. Tinton Falls Borough, 1 N.J. Tax 445, 458 (Tax 1980) (citing Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959), certif. denied, 30 N.J. 153 (1959)).

During trial, in explaining the basis for his location adjustments to land sale three, plaintiffs' appraiser expressed only that "development in Lakewood barely stopped during the recession, it was going pretty well relative to the rest of the world." Moreover, plaintiffs' appraisal report offers no meaningful support for his location adjustments, stating only that land sale three and five "are in superior Ocean County locations." The facts, surveys, data or sales information upon which plaintiffs' appraiser relied to conclude that land sales three and five were superior to the subject properties and that his downward -10% location adjustment was warranted were not set forth in his appraisal report or in his testimony.

In addition, plaintiffs' appraiser's time adjustments improperly attempt to link the sale price of single-family dwellings with the sale price of vacant land which has not been subdivided, without offering any evidence that the value of vacant land declined, or declined at the same rate as single-family dwellings. In fact, if this court was to accept plaintiffs' appraiser's bare conclusions that land sales three and five were in "superior Ocean County locations," the court would have to consider that those sales demonstrate the inverse may be true. Land sale five sold in October 2009 for $86,751 per acre and land sale three sold one year later, in September 2010, for $122,623 per acre. According to plaintiffs' appraiser's single-family dwelling sales analysis, a -9.50% adjustment would be warranted over the 2009 to 2010 time period. Instead, the court observes that a 40% increase existed in the per acre value of vacant land between these Ocean County locations. Even if the court accepted plaintiffs' appraiser's proposed adjustment for approvals of -25%, a 15% increase in the value of vacant land remains; not a decrease of 9.50%. This results in a difference of almost 25%. Thus, the court finds plaintiffs' appraiser's proposed time adjustments are without adequate support in the record, grounded in objective market data. Moreover, the foregoing analysis by the court casts doubt on the credibility of plaintiffs' appraiser's time adjustments.

Plaintiffs' appraiser's approvals and lot size adjustments must be rejected for similar reasons. The court readily acknowledges that obtaining subdivision approvals can take time, resources and involve a certain measure of risk. However, plaintiffs' appraiser offered only his unsupported conclusions with respect to an adjustment amount, without supplying any objective market data, surveys, analysis or statistics associated with the costs to obtain approvals. Moreover, the court observes that lot size alone does not dictate value; other factors including lot location, accessibility and proximity to natural resources can materially affect value. For

19

instance, a 10,000 square foot vacant building lot adjacent to a waterfront or bay may sell for significantly more than a 15,000 square foot lot that is located miles from any waterway. Here, the Trocki property and I&S property are immediately adjacent to Lakes Bay, however none of plaintiffs' appraiser's comparable land sales are adjacent to any waterway.

The court further observes that a wide disparity exists between the size of the comparable land sales and the size of the Trocki property and I&S property. The I&S property is approximately 139% smaller than land sale one, 416% smaller than land sale two, 611% smaller than land sale three, 1567% smaller than land sale four, and 125% smaller than land sale five. Similarly, the Trocki property is approximately 95% smaller than land sale one, 320% smaller than land sale two, 479% smaller than land sale three, 1257% smaller than land sale four and 83% smaller than land sale five.

By definition, comparability does not require properties to be identical, as "differences between a comparable property and the subject property are anticipated. Such differences are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Township, 9 N.J. Tax 66, 72 (Tax 1987). However, here, plaintiffs' appraiser offered no meaningful explanation to account for the wide disparity that exists in property size between the subject properties and his comparable land sales.

The court further highlights that plaintiffs' appraiser's proposed highest and best use for the subject properties was derived by a process of elimination, and not based upon an examination and analysis of demand in the marketplace. Plaintiffs' appraiser excluded consideration of continued use of the subject properties as a motel, as multi-family residential

apartments and as multi-family townhomes. However, plaintiffs' appraiser conducted no evaluation of the subject property to determine how many building lots the subject property would yield and introduced no evidence or data that it would be financially feasible or maximally productive to subdivide the subject properties and erect single-family dwellings. When an appraiser proposes a highest and best use that requires subdivision into single-family residential building lots "an analysis of the feasibility of a subdivision development – a more detailed market analysis will be required." Appraisal Institute, The Appraisal of Real Estate, 42 (14th ed. 2013). A property must be valued as it was used on the valuation date, and the party proposing an alternate highest and best use bears the burden, by a fair preponderance of the evidence, of presenting evidence to support its position. Highview Estates v. Borough of Englewood Cliffs, 6 N.J. Tax 194, 200 (Tax 1983); Penns Grove Gardens, Ltd. v. Borough of Penns Grove, 18 N.J. Tax 253, 263 (Tax 1999); Ford Motor Corp., supra, 10 N.J. Tax at 167; Clemente, supra, 27 N.J. Tax at 269. Here, plaintiffs have not presented evidence sufficient for this court to conclude, by a fair preponderance of the evidence, the highest and best use of the subject properties is for a single-family residential development.

Finally, assuming that the cost to construct a single-family dwelling paralleled the $105.07 opined by plaintiffs' appraiser to construct a townhome, and further assuming the average size of a newly constructed single-family dwelling in Egg Harbor Township was approximately 2,500 square feet.[4] The cost to build a single-family dwelling would be approximately $262,675 ($105.07 x 2,500 square feet). However, according to plaintiff's appraiser, the median sale price of single-family homes in Egg Harbor Township was $255,611 in 2009, $227,736 in 2010 and $222,716 in 2011. Without accounting for any costs associated

---

[4] Plaintiffs' appraiser offered testimony that the size of the townhome units in the immediately adjacent development were in excess of 2,300 square feet.

with the land or the subdivision and development process, the court finds it implausible that redevelopment of the subject property into a single-family residential development would be a financially feasible or maximally productive use. Accordingly, for the reasons set forth herein above, the court rejects plaintiffs' appraiser's proposed highest and best use of the subject properties and adjustments to the comparable land sales, and concludes that plaintiffs' appraiser's sales comparison approach to value the subject properties does not produce a credible result.

### d. Defendant's Approach to Value

In contrast to plaintiffs' appraiser, defendant's appraiser concluded that the highest and best use of the subject properties is continuation of the existing use as a motel. Although defendant's appraiser conceded that "it is unlikely that, if vacant and available for development, a hotel/motel would be built" on the subject properties, after reviewing and analyzing the subject property and available market data, he concluded that the highest and best use of the subject properties is the "existing development," as a motel. In the opinion of defendant's appraiser, the continued operation of the Travelodge as of the October 1, 2009, October 1, 2010, and October 1, 2011 valuation dates, further supports its highest and best use as a motel. Defendant's appraiser further expressed that when a motel maintains a nationally recognized flag, such as the Travelodge flag, although internal motel operations may be affected, the use of the subject property as a motel will usually remain the most maximally productive use. Defendant's appraiser examined all three approaches to value, ultimately concluding that the income capitalization approach should be employed to value the subject properties.

In defendant's appraiser's opinion, the I&S property is an "integral part" of the Trocki property, providing a "private access road for the benefit of the Travelodge" and its guests.

22

Therefore, defendant's appraiser concluded that the Trocki property and the I&S property are "joined in a Unity of Use and Value. . . [and] cannot be separated."

Defendant's appraiser reviewed the audited income and expense statements furnished by plaintiffs. However, in defendant's appraiser's opinion, such statements were unreliable because they reported rent expenses, amortization income, travel expenses and other "unreliable data, that I could not verify and could not check." Specifically, defendant's appraiser highlighted that the Travelodge's Statement of Revenues and Expenses for the year ending December 31, 2009 identified gross revenues of only $457,662, however a separate line item of $123,414 identified as "other hotel revenue" is included, without any explanation for how that income was derived. In addition, defendant's appraiser noted that the Travelodge's income and expense statements contain deductions for certain expenses, without any explanation for these expenses. Moreover, because expenses, such as rent, were paid by the Travelodge to Picasso's, Inc., a corporation owned by Dr. Trocki, defendant's appraiser opined that the expense statements were unreliable to develop an estimate of stabilized expenses. Defendant's expert also took exception to plaintiffs' deductions for depreciation, real estate taxes, and amortization. Defendant's appraiser offered that while it may be appropriate to deduct these expenses under federal income tax laws, they should not be deducted when determining the value of real property under the income-capitalization approach.

Defendant's appraiser examined the revenues reported by plaintiffs on their income and expense statements and compared those revenues to average daily room rates and occupancy rates he obtained from Smith Travel Research, Inc. ("STR"). STR is a fee-based service provider who collects, benchmarks, and analyzes data on hotels and motels worldwide. Defendant's appraiser purchased a report from STR captioned "Egg Harbor Township, NJ Area

Selected Properties" for the period July 2010 through April 2014. After analyzing the data, defendant's appraiser concluded that the revenues reported by plaintiffs were not representative of the market or of the economic rent which could be derived from proper operation of the Travelodge.

The formula applied by defendant's appraiser to derive an opinion of the fair market value for the subject properties included the following steps: (1) computing gross stabilized revenues from room rates, including revenues derived from food and beverage service, as a function of the average occupancy rates and average daily room rates; (2) deducting stabilized expenses to determine the estimated effective gross revenues; (3) deducting a percentage of gross revenues allocated to motel management; (4) applying a capitalization rate to the stabilized income of the motel; and (5) deducting the depreciated value of the furniture, fixtures and equipment ("FF&E") from the capitalized value.

According to the STR report, average occupancy rates in the Egg Harbor Township environs hotel/motel market during the period July 2010 to October 2012 ranged from 29% to 69.10%. Thus, in the opinion of defendant's appraiser, a stabilized occupancy rate of 40% should be applied to the Travelodge. The STR report further reported average daily room rates in the Egg Harbor Township hotel/motel market during the July 2010 to October 2012 period ranged from $44.74 to $89.26. Thus, in the opinion of defendant's appraiser, a stabilized daily room rate of $68.00 should be applied to the Travelodge.

Therefore, defendant's appraiser stabilized the estimated revenue attributable to the Travelodge as follows: 197 rooms x 365 days x $68.00 average daily room rate x 40% occupancy rate = $1,955,816. Defendant's appraiser then stabilized anticipated food and beverage income at 3% of the stabilized room revenues, or $58,674. Although defendant's

24

appraiser conceded that the Travelodge is a limited service motel, serving only a continental breakfast to motel patrons without charge, defendant's appraiser opined that the Travelodge could derive additional revenue from charging a fee for breakfast service. Next, defendant's appraiser testified that he examined PKF Hospitality Research Group studies and concluded that a ratio of stabilized expenses to effective gross revenues of 65% exists in the hotel/motel industry.[5] Therefore, he adopted stabilized expenses of 65% of gross revenues, or $705,071, and deducted that sum from the gross stabilized revenues. Defendant's appraiser then allocated 5% of the effective gross revenues to the management fees of the motel, or $35,253 and deducted that sum from the effective gross revenues. As a result, defendant's appraiser concluded a net stabilized income attributable to the Travelodge's real estate and FF&E of $669,817 ($1,955,816 + $58,674 = $2,014,490 - $705,071 - $35,253 = $669,817).

Defendant's appraiser then capitalized the stabilized income at an average rate of 10.5% for all tax years to determine a rounded value of the real estate and FF&E of $6,379,000 ($669,817/.105 = $6,379,209.50). To arrive at his capitalization rate, defendant's appraiser relied upon Korpacz/Price Waterhouse Coopers surveys of the "National Economy/Limited-Service Lodging Segment" for the 3rd quarter 2009, 3rd quarter 2010, and 3rd quarter 2011. The court's review of the Korpacz/Price Waterhouse Cooper surveys reveals a range of overall capitalization rates as follows: 9.00% to 14.00% for 3rd quarter 2009; 8.00% to 12.00% for 3rd quarter 2010; and 8.00% to 12.00% for 3rd quarter 2011.

Finally, defendant's appraiser deducted the sum of $250,000 from his derived value of the Travelodge to account for the contributing value of the FF&E, to derive a market value for

---

[5] Defendant's appraisal report did not contain copies of the PKF Hospitality Research Group studies that defendant's appraiser examined in deriving a ratio of expenses to revenues.

the subject properties as of each of the valuation dates of $6,129,000 ($6,379,000 - $250,000 = $6,129,000).

### e. Income Capitalization Approach

When a property is income-producing, the preferred method for determining the estimated market value of that property is the income capitalization approach. Parkway Village Apartments Co. v. Township of Cranford, 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); see also Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). Moreover, our courts have recognized that "the income approach is a viable method of appraising hotels and, in many cases, is given the greatest weight. Knowledgeable buyers of lodging facilities generally base their purchase decisions on factors such as forecasted net income and return on investment. . ." Glen Pointe Associates v. Teaneck Twp., 10 N.J. Tax 380, 390 (Tax 1989), aff'd, 12 N.J. Tax 118 (App. Div. 1990) (internal citation omitted); see also Chesapeake Hotel LP v. Saddle Brook Twp., 22 N.J. Tax 525, 526-27 (Tax 2005).

"The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." The Appraisal of Real Estate, supra, at 439. Central to the income capitalization approach is the appraiser's scrutiny, evaluation and analysis of data, information, statistics, costs, and a property's capacity to generate future benefits in order to determine the "'market rent or fair rental value'" of a property. Parkway Village Apartments Co., supra, 108 N.J. at 270; see also Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996).

However, our courts have recognized that "in the absence of convincing evidence to the contrary, the actual rent of a well-managed apartment complex functioning with customary leases of relatively short length is prima facie representative of economic rent. . ." Parkway Village Apartments Co., supra, 108 N.J. at 276. This presumption of competent management similarly attaches to hotels and motels and the burden rests with the municipality to prove, by convincing evidence, that a property is poorly managed. Glen Pointe Associates, supra, 10 N.J. Tax at 390; see also Westmount Plaza v. Twp. of Parsippany, 11 N.J. Tax 127, 131 (Tax 1990); Prudential Insurance v. Parsippany-Troy Hills, 16 N.J. Tax 58, 62 (Tax 1995); Equitable Life Assurance v. Town of Secaucus, 16 N.J. Tax 463, 467 (App. Div. 1996). Although the criteria necessary to overcome this presumption are not unattainable, Judge Small observed that the "burden of establishing by convincing evidence that a subject property is badly managed and not a comparable for itself is so great that there is no reported tax case in New Jersey where a Court has found bad hotel management." Equitable Life Assur. Soc. of U.S., supra, 16 N.J. Tax at 467.

Here, defendant's appraiser disregarded the income and expense statements furnished by plaintiffs. Defendant's appraiser concluded these statements were "unreliable" because the statements identify expenses such as "rent," "management fee," "auto expense," and "travel," without explanation for the derivation of the expense. Moreover, comparing the gross revenues reported by Trocki Hotels to the average daily and occupancy rates contained in the STR report, defendant's appraiser concluded that the gross revenues were not representative of market rates. Therefore, defendant's appraiser relied exclusively on the STR report for his average daily room and room occupancy rates in order to compute his stabilized income. However, income and expense statement aberrations are not alone convincing evidence sufficient to overcome the presumption that a hotel or motel is well-managed. An expense statement that is not "within

normal operating limits" may justify "an adjustment be made to fit the 'well-managed' standard," however it does not demonstrate that a motel or hotel is poorly managed. Equitable Life Assur. Soc. of U.S., supra, 16 N.J. Tax at 467 (quoting Parkway Village Apartments, supra, 108 N.J. at 276). Here, defendant's appraiser did not consider or know the average daily room rates for the Travelodge, did not investigate the occupancy rates for the Travelodge, and made no inquiry into how room revenue was being generated in the operation of the Travelodge, other than his review of the audited financial statements.

Additionally, effective cross-examination revealed that the STR report, exclusively relied upon by defendant's appraiser to establish the range of average daily room and occupancy rates, was not limited to Egg Harbor Township motels, but rather included "Egg Harbor Township and Travelodge [flags] within fifty miles" of the subject properties. Thus, the range and accuracy of the average daily room and occupancy rates that were applicable only to the Egg Harbor Township motel marketplace was unknown by defendant's appraiser.

Effective cross-examination further revealed that defendant's appraiser considered the Travelodge a "seasonal hotel," located in "seasonal area." Thus, motel occupancy during the winter months suffers and occupancy during summer months peaks. Conversely, average daily room rates decline in the winter months and surge in the summer months. However, defendant's appraiser performed no analysis of the average daily room and occupancy rates of the Travelodge during the off-peak and peak months to discern the range of rates.

Defendant's appraiser further conceded during cross-examination that as of the valuation dates at issue there was an over-supply of motel rooms in the Egg Harbor Township market. Although a surplus of motel rooms existed, defendant's appraiser did not consider how this surplus affected the average daily room and occupancy rates of the Travelodge.

Cross-examination also revealed that the average daily room and occupancy rates employed by defendant's appraiser and reflected in the STR report did not take into consideration the quality and character of the Travelodge, the competition in the marketplace, or the décor, chain or flag affiliation and amenities offered by other motels in the marketplace.

Moreover, a clear and logical explanation was offered during trial by Dr. Trocki for the expenses highlighted by defendant's appraiser. Dr. Trocki explained that: (i) the expense item categorized as "rent" was actually a management fee paid by the Travelodge to Picasso's, Inc. for managing and operating the motel; (ii) the expense item categorized as "management fee" was for services rendered by an outside motel management consultant to review and analyze the management and operations of the Travelodge; (iii) the expense item categorized as "auto expense" encompassed expenses for operation, maintenance and repair of vans owned and rented by the Travelodge to provide local transportation for motel guests; (iv) the expense item categorized as "travel" expense included expenses incurred by the Travelodge to send its general manager and front desk manager to motel training seminars required by the franchisor and to solicit groups and organizations to use the Travelodge motel.

Defendant's appraiser's contention that the income and expense statements should be disregarded simply because the Travelodge was being managed by Picasso's, Inc. is also not supported by the record before the court. The record reveals that Dr. Trocki is well-versed in the operation and management of motels and large apartment complexes, having owned and operated a number of facilities, including the Clarion Hotel and Convention Center and Holiday Inn Express in Egg Harbor Township. Additionally, the court's own review of the management fee paid by plaintiffs to Picasso's, Inc. during the 2009 tax year reveals that it represents

approximately 6.58% of the Travelodge's gross revenues, a figure that closely resembles the 5% management fee proposed by defendant's appraiser in his income-capitalization approach.

Finally, although the court is charged with the task of determining the true market value of the subject properties as of the October 1, 2009, October 1, 2010 and October 1, 2011 valuation dates, defendant's appraiser's STR report recites average daily room and occupancy rates only for the period of July 2010 through October 2014. Defendant's appraiser did not present any market data, surveys or information to the court with respect to the average daily room and occupancy rates during the 2009 calendar year and first six months of 2010.

Here, defendant has not met its burden of proving, by convincing evidence, that the Travelodge motel is poorly managed. The court concludes that the financial difficulties experienced by plaintiffs during the 2009, 2010 and 2011 tax years were not caused by bad management, but rather the decline of the Atlantic City gaming and hotel market and the well-documented economic downturn that began in late 2007, plunging the United States into one of the worst recessions it had experienced in decades. Although the court readily observes that during 2009 the Travelodge's gross expenses exceeded its gross revenues by a ratio margin of 1.67 to 1, good management of a hotel or motel is nonetheless presumed. Glen Pointe Associates, supra, 10 N.J. Tax at 390. The court therefore concludes that the irregularities observed by defendant's appraiser in the expenses reported by the Travelodge can be accounted for by making an "adjustment. . . to fit the 'well-managed' standard." Equitable Life Assur. Soc. of U.S., supra, 16 N.J. Tax at 467 (quoting Parkway Village Apartments, supra, 108 N.J. at 276).

f.  Determination of Value

Plaintiffs' counsel argues that in spite of defendant's appraiser's conclusion that the subject properties were a single economic unit and joined in a unity of use and operation,

defendant's appraiser was required to develop separate opinions of value for the Trocki property and I&S property. As a result of this alleged deficiency, plaintiffs' counsel urges the court to reject defendant's appraiser's conclusion of value. As authority for this proposition, plaintiffs' counsel points to an unreported Tax Court decision Tip's Trailer Park, Inc. v. Twp. of Fairfield, 2014 N.J. Tax Unpub. LEXIS 87, 2014 WL 2895795, at 11 (N.J. Tax Ct. June 25, 2014). However, it is well settled that "[n]o unpublished opinion shall constitute precedent or be binding upon any court." R. 1:36-3; see also Trinity Cemetery Assoc. v. Township of Wall, 170 N.J. 39, 48 (2001). Thus, the opinion cited by plaintiffs' counsel is not authority, binding the court in this matter. Nonetheless, the court finds a general lack of support for plaintiffs' counsel's argument.

A unity of use is established when there is "a connection or relation of adaptation, convenience and actual. . . use to make the enjoyment of one [parcel] reasonably necessary to the enjoyment of the other [parcel]. . ." Manalapan v. Genovese, 187 N.J. Super. 516, 521 (App. Div. 1983). Thus, when separately assessed parcels are integral parts of a single economic unit an appraiser should develop an opinion of value that takes into consideration the entire economic operation and how the individual component parts contribute to the value of the whole. Authority for such an approach can be found in Purex Corp. v. Paterson City, 8 N.J. Tax 121 (Tax 1986); Mobil Oil Corp. v. Greenwich Twp., 9 N.J. Tax 123 (Tax 1986); and Atlantic City v. Ginnetti, 17 N.J. Tax 354, 362-363 (Tax 1998), aff'd, 18 N.J. Tax 672 (App. Div. 2000).

An appraisal is "'the act or process of developing an opinion of value' of an asset." The Appraisal of Real Estate, supra, at 2. In performing an appraisal, an appraiser is duty-bound to value the property according to its highest and best use. However, when the subject of the appraisal includes multiple integrated properties, the appraiser may reasonably conclude that the

properties should be valued as a single economic unit, rather than as a number of fractional parts. Here, defendant's appraiser concluded that the Trocki property and I&S property shared a unity of use and, correspondingly, should be valued as a single economic unit. Plaintiffs charge that after defendant's appraiser reached his conclusion of value for the subject properties as a single economic unit, he was required to apply a fractional appraisal method, and attribute a separate value to the individual components of the subject property, so that "the appropriate assessment" could be imposed. However, the obligation to fix a local property tax assessment is a function of the court, under N.J.S.A. 54:51A-6, or the municipal tax assessor, under N.J.S.A. 54:4-23, once a conclusion has been reached regarding the estimated true market value of the property as of October 1st of the pretax year. Any attempt by defendant's appraiser to allocate the true market value of the subject properties among its individual component parts after he has valued it as a single economic unit would likely be random and arbitrary. In fact, this court has observed that allocations of local property tax assessments among properties comprising a single economic unit "are usually arbitrary" and "the correct assessment is to be based on the total value of the entire complex." Mobil Oil Corp., supra, 9 N.J. Tax at 127. Thus, the court rejects plaintiffs' counsel's assertion that defendant's appraiser was required to assign separate values to the component parts of a property that was valued as a single economic unit.

Here the court concludes, as did defendant's appraiser, that the Trocki property and I&S property are joined in a unity of use and operations, and their parts cannot be fairly and adequately considered separately. First, Trocki Hotels and I&S Associates share common ownership, as controlling interests in both entities are owned by Dr. Trocki. Second, the Trocki property and I&S property are constituent parts of a single economic unit, the Travelodge motel. The I&S property is instrumental to the effective operation of the Travelodge, providing an

alternate means of vehicular ingress and egress along Black Horse Pike. Third, the ties and inter-relationship between the two properties are a material component of the Travelodge's marketing and promotional materials. By virtue of the dune-like landscape of the I&S property, motel guests are afforded expansive and open views of Lakes Bay from guest rooms and from a rear patio/deck area of the Travelodge. These physical characteristics are highlighted in the marketing and promotional material generated by the Travelodge as the availability of "Bayview Rooms," an "Outdoor Seasonal Pool and Deck on Bay," and a "Privately Owned Bayside Beach." Thus, the court is satisfied that the I&S property furthers the operation and use of the Travelodge motel. The subject properties are joined in a unity of use and operation, and constitute a single economic unit. See Housing Authority of Newark v. Norfolk Realty Co., 71 N.J. 314, 322 (1976).

Additionally, based on the record and evidence adduced, and for the reasons more fully expressed herein, the court concludes that the highest and best use of the subject property is continuation of the existing use as a limited service motel. Moreover, the court is satisfied that the income-capitalization approach produces a more credible result in valuing the subject properties than does any other approach to value. "Knowledgeable buyers of lodging facilities generally base their purchase decisions on factors such as forecasted net income and return on investment, which are not reflected in the cost approach" or sales comparison approach. Glen Pointe Associates, supra, 10 N.J. Tax at 390.

However, this court is charged with the responsibility to apply its own expertise and "judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Associates v. Wall Twp., 99 N.J. 265, 280 (1985). "[T]he trial judge as the factfinder is not bound by the opinion valuation of the experts

33

on either side. Just as a jury, a judge may adopt 'so much of it as appears sound, reject all of it, or adopt all of it.'" Riorano, Inc. v. Weymouth Township, 4 N.J. Tax 550, 564 (Tax 1982) (quoting State Highway Com. v. Dover, 109 N.J.L. 303, 307 (E. & A. 1932)).

Because defendant failed to overcome the presumption of good management that attaches to the subject properties, the court must reject defendant's appraiser's proposed stabilized revenues and instead accepts plaintiffs' reported gross revenues, with adjustments to fit within the "'well-managed' standard." Equitable Life Assur. Soc. of U.S., supra, 16 N.J. Tax at 467.

The evidence adduced during trial, including plaintiffs' appraiser's reproduced abstract of the Travelodge's operating revenues and defendant's appraiser's reproduced copy of plaintiffs' Statements of Revenues and Expenses for the tax year ended December 31, 2009, revealed that plaintiffs' gross revenues were as follows: $579,118 for the 2009 calendar year; $776,195 for the 2010 calendar year; and $836,663 for the 2011 calendar year. Therefore, the court will attribute the following stabilized revenue to the Travelodge: (i) $579,118, as of the October 1, 2009 valuation date; (ii) $776,195, as of the October 1, 2010 valuation date; and (iii) $836,663, as of the October 1, 2011 valuation date.

The record further reveals that the Travelodge offers limited breakfast service and does not offer room service, beverage service, or other meal service to motel guests. However, the Travelodge does not assess any charge or fee to motel guests for breakfast and thus, derives no revenue from breakfast service. In defendant's appraiser's opinion, the Travelodge could reasonably charge for breakfast, and therefore, in his opinion, food and beverage revenue of 3% of gross revenues should be included in the Travelodge's gross revenues. The court finds credible defendant's appraiser's conclusion that additional revenue could be derived by the Travelodge by charging a fee for breakfast and beverage services. However, because the

Travelodge is only a limited service motel, without any restaurant, affording patrons only restricted breakfast service, the court concludes that defendant's appraiser's food and beverage service income of 3% of gross revenues is not credible. The court concludes that a more credible approach would be to stabilize food and beverage service at 1% of the gross room revenues, or $5,791 as of October 1, 2009; $7,762 as of October 1, 2010; and $8,367 as of October 1, 2011. The 1% figure is further supported by the court's review of the "Supplemental Data" report of the "Travelodge formerly Red Roof Inn" for the year ended December 31, 2007 annexed to defendant's appraisal report. That statement discloses that "Lounge Sales – Beverage" amounted to approximately 1% of the Travelodge's room sales for the 2007 calendar year.

In addition, although not attached to his appraisal report, defendant's appraiser offered credible testimony with respect to the contents of the PKF Hospitality Research Group studies he consulted for limited service motels, like the Travelodge. Based on his review of those studies, the limited service motel industry experiences an average ratio of stabilized expenses to effective gross revenues of 65%. The court finds defendant's appraiser's testimony credible on this issue and adopts stabilized expenses of 65% of gross revenues. Therefore, the court determines plaintiffs' stabilized expenses to be as follows: $380,191 as of October 1, 2009; $509,572 as of October 1, 2010; and $549,270 as of October 1, 2011.

"One method of separating the real estate and business interest in hotel valuation is to extract from hotel revenues the fee paid by the owner to a management company pursuant to a management contract." Glen Pointe Associates, supra, 10 N.J. Tax at 391. This technique, also known as the Rushmore approach, is a well-recognized method for determining the true market value of hotels and motels. See also Marina Dist. Development Co., LLC, supra, 27 N.J. Tax at 492; City of Atlantic City v. Ace Gaming LLC, 23 N.J. Tax 70, 97-8 (Tax 2006). This approach

is premised on the theory that by employing a professional managing agent, the owner is placed into the position of passive investor, thereby eradicating any potential profit that may be derived from motel business operations. Defendant's appraiser relied upon and produced copies of published studies from Korpacz/PWC of the limited service hotel and motel market as of the Third Quarter 2009, Third Quarter 2010 and Third Quarter 2011. Korpacz/PWC is a respected and well-known financial analysis firm. The study data is commercially available, widely circulated and frequently relied upon by professionals in the real estate appraisal field. The court's review of those studies reveals that the "Lodging Management Fees" for "Economy/Limited Service" lodging establishments averaged: 3.33% as of the Third Quarter 2009; 3.30% as of the Third Quarter 2010; and 3.45% as of the Third Quarter 2011. Defendant's appraiser allocated 5% of the effective gross revenue to management fees. In light of the data revealed in the Korpacz/PWC studies, the court concludes that it is more reasonable to assign a management fee of 3.35% to the management and business interest of the Travelodge for the 2010, 2011 and 2012 tax years, computed as follows: $6,858 as of October 1, 2009; $9,192 as of October 1, 2010; and $9,908 as of October 1, 2011.

Defendant's appraiser further relied on published studies of the Limited-Service Lodging Segment from Korpacz/PWC in order to determine his capitalization rates for the relevant time periods. The studies are generated from surveys completed by investors who took part in real estate transactions during the survey period. The court has reviewed the Korpacz/PWC studies which express an average overall capitalization rate of 10.85% as of Third Quarter 2009, 10.20% as of Third Quarter 2010, and 9.80% as of Third Quarter 2011 for the Limited-Service Lodging Segment. After considering the foregoing studies, defendant's appraiser concluded that a 10.5% capitalization rate should be applied to the stabilized income allocable to the real estate and

FF&E as of the October 1, 2009, October 1, 2010 and October 1, 2011 valuation dates. In light of the data revealed in the Korpacz/PWC studies, the court concludes that it would be more reasonable to apply a capitalization rate of 10.85% as of the October 1, 2009 valuation date; 10.20% as of the October 1, 2010 valuation date; and 9.80% as of the October 1, 2011 valuation date.

Plaintiffs argue that defendant's appraiser failed to examine the actual FF&E inventory of the Travelodge, and therefore, defendant's contributing value of the FF&E must be rejected by the court. However, defendant's appraiser credibly testified that he assessed the age and condition of the FF&E during his inspections of the motel rooms and property between 2010 and 2014. Based on his visual inspections of the FF&E, defendant's appraiser concluded that the FF&E was principally at the end of its useful life expectancy. Accordingly, defendant's appraiser employed the straight-line method to isolate the FF&E value from the real property component of the Travelodge. This method computes the yearly return of personal property based upon the estimated total replacement cost of the FF&E and divides that figure by the estimated annual life expectancy of the FF&E. After consulting the Marshall & Swift valuation manuals, defendant's appraiser calculated the "cost new" of the Travelodge's FF&E as $1,625,250. Defendant's appraiser then determined that accrued depreciation of 85% existed with respect to the Travelodge's FF&E. Therefore, defendant's appraiser applied a depreciation rate of 15% to the "cost new" of the FF&E to determine the contributing value of the Travelodge's FF&E as $250,000 per year. The court concludes that defendant's appraiser's approach to valuing the FF&E is credible and provides a useful mechanism to isolate components of business operating income from the value of the real property.

Therefore, the court's calculation of true market value is as follows:

|  | As of 10/1/2009 | As of 10/1/2010 | As of 10/1/2011 |
|---|---|---|---|
| **Room Revenues** | $579,118 | $776,195 | $836,663 |
| **Food and Beverage** | $5,791 | $7,762 | $8,367 |
| **TOTAL:** | | | |
| **Stabilized Revenues** | $584,909 | $783,957 | $845,030 |
| **LESS:** | | | |
| **Stabilized Expenses** | $380,191 | $509,572 | $549,270 |
| **Effective Gross Revenue** | $204,718 | $274,385 | $295,760 |
| **LESS:** | | | |
| **Allocation to Business** | $6,858 | $9,192 | $9,908 |
| **TOTAL:** | | | |
| **Real estate/FF&E Stabilized Income** | $197,860 | $265,193 | $285,852 |
| **Capitalization Rate** | 10.85% | 10.20% | 9.80% |
| **TOTAL:** | | | |
| **Real estate & FF&E value** | $1,823,594 | $2,599,931 | $2,916,857 |
| **LESS:** | | | |
| **Contributing value FF&E** | $250,000 | $250,000 | $250,000 |
| **TRUE MARKET VALUE** | $1,573,594 | $2,349,931 | $2,666,857 |

Having reached a conclusion of the true market value of the subject properties, the court will turn its attention to a determination of the correct assessment for the 2010, 2011 and 2012 tax years. Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property...." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b).

For the 2010 tax year, the ratio of total assessed value, $4,070,100, to true market value, $1,573,594, yields a ratio of 2.5865% which exceeds the upper limit of the Chapter 123 common level range. Consequently, under N.J.S.A. 54:51A-6(a), the formula for determining the revised taxable value of the subject properties for the 2010 tax year is:

True market value    x    Average ratio  =    Revised taxable value

Thus, the calculation for the 2010 tax year is:

$1,573,594     x     .5106%     =     $803,500 [ROUNDED]

For the 2011 tax year, the ratio of total assessed value, $4,070,100, to true market value, $2,349,931, yields a ratio of 1.732% which exceeds the upper limit of the Chapter 123 common level range. Consequently, under N.J.S.A. 54:51A-6(a), the formula for determining the revised taxable value of the subject properties for the 2011 tax year is:

Thus, the calculation for the 2011 tax year is:

$2,349,931     x     .5417%     =     $1,273,000 [ROUNDED]

For the 2012 tax year, the ratio of total assessed value, $4,070,100, to true market value, $2,666,857, yields a ratio of 1.5262% which exceeds the upper limit of the Chapter 123 common level range. Consequently, under N.J.S.A. 54:51A-6(a), the formula for determining the revised taxable value of the subject properties for the 2012 tax year is:

Thus, the calculation for the 2012 tax year is:

$2,666,857     x     .5787%     =     $1,543,300 [ROUNDED]

The parties are directed to provide a proposed allocation of the above between the Trocki property and I&S property within ten (10) business days of the receipt of this letter opinion, after which the court will enter judgments in accordance therewith. See R. 8:9-3; R. 9-4

Very truly yours,


/s/Hon. Joshua D. Novin, J.T.C.

39